[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-15981

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 14, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-00146-CV-AAA

ROBERT L. NEWLAND,

                                                      Petitioner-Appellant,

versus

HILTON HALL,
Warden, Georgia Diagnostic Prison,

                                                      Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(May 14, 2008)**

Before TJOFLAT, ANDERSON and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

On August 14, 1987, the petitioner, Robert Newland, was convicted in the Superior Court of Glynn County, Georgia of malice murder and aggravated assault with intent to commit rape.[1]  The following day, at the conclusion of the penalty phase of the trial, the jury recommended that petitioner be sentenced to death for the murder.  The court followed the jury's recommendation and sentenced petitioner accordingly.[2]  After exhausting his direct appeal and collateral attack remedies in state court, petitioner applied to the United States District Court for the Southern District of Georgia for a writ of habeas corpus, challenging his convictions and death sentence on several federal constitutional grounds.  The court denied the writ.  We granted petitioner a certificate of appealability,

---

[1] Petitioner was charged in separate counts with murder in violation of O.C.G.A. § 16-5-1(a) (1982); felony murder predicated on aggravated assault with a deadly weapon in violation of O.C.G.A. § 16-5-1(c); felony murder predicated on aggravated assault with intent to rape in violation of O.C.G.A. § 16-5-1(c); aggravated assault with intent to commit rape in violation of O.C.G.A. § 16-5-21(a)(1); and aggravated assault with a deadly weapon in violation of O.C.G.A. § 16-5-21(a)(2).

The jury did not return a verdict on the felony murder counts because the court, pursuant to O.C.G.A. § 16-1-7 (1982), instructed the jury that it could find the defendant guilty of either malice murder or felony murder since section 16-1-7 prohibits a conviction for both malice murder and felony murder for the death of a single victim.  Nix v. State, 625 S.E.2d 746, 748 (Ga. 2006); Wade v. State, 368 S.E.2d 482, 485 (Ga. 1988).  Because the jury convicted petitioner of malice murder, the court dismissed the felony murder counts.  The court dismissed the aggravated assault with a deadly weapon count because it determined that the charge in that count "merged with" the malice murder conviction.  Section 16-1-7 bars a conviction for a crime included within a greater offense.  Curtis v. State, 571 S.E.2d 376, 379 (Ga. 2002).

[2] The court sentenced petitioner to a twenty-year prison term on the aggravated assault with intent to commit rape count, to run consecutively with the sentence for murder.

authorizing an appeal raising five issues.[3]

In his opening brief, petitioner presents only two of the issues; both question whether his attorneys provided him the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. The first issue concerns the admissibility of the confession petitioner gave the police. Petitioner claims that the confession was involuntary, the product of police coercion, and that his trial attorney rendered ineffective assistance of counsel in failing to convince the court that it was inadmissible on that ground. He claims that his appellate attorney rendered ineffective assistance of counsel in failing to appeal the trial court's admission of the confession into evidence. The second issue concerns the adequacy of counsel's preparation for and prosecution of petitioner's case at the penalty phase of the trial and asks whether counsel was constitutionally ineffective in failing adequately to search for and present to the jury certain mitigating evidence.[4]

---

[3] We granted the certificate of appealability ("COA") after the district court declined to do so.

[4] Petitioner's brief presents an issue not included in the COA: whether counsel performed ineffectively at the guilt phase of the prosecution in failing to "obtain mental health assistance." Our review is limited to the issues enumerated in the COA. See Murray v. United States, 145 F.3d 1249, 1251 (11th Cir. 1998). Petitioner's application for a COA limited the issue of whether counsel was ineffective in seeking and presenting mitigating evidence to counsel's handling of petitioner's case at the penalty phase of the trial. The application stated that "Mr. Newland received ineffective assistance of counsel in violation of the Sixth Amendment . . . when counsel failed to conduct a life history investigation or obtain mental health assistance at

The Georgia courts, applying Supreme Court precedent, found no constitutional deficiency in counsel's performance. The district court, in denying habeas relief, concluded that the Georgia courts properly applied that precedent in disposing of petitioner's challenges. We agree with the district court and therefore affirm its judgment.

This opinion is organized as follows. Part I describes the commission of the crimes in this case as presented to the jury. Part II discusses the procedural history of the case as it wound its way through the state courts and the district court on collateral review. We recount in considerable detail defense counsel's challenge to the validity of petitioner's confession and counsel's preparation for and prosecution of petitioner's case at the penalty phase of the trial. Part III states the legal standards governing our disposition of petitioner's claims, and parts IV – VI dispose of those claims. Part VII concludes our discussion.

I.

A.

Petitioner and Margaret Beggs, his girlfriend of four years, moved to Glynn County, Georgia in February 1984. Petitioner was self-employed as a drywall

---

the penalty phase of his capital trial." In short, neither petitioner's application for a COA nor the COA we issued raises the issue of whether counsel should have obtained mental health assistance at the guilt phase of the trial.

construction contractor and Beggs was employed as a social worker in a local mental health clinic. They lived in a house at 230 Broadway Street on St. Simon's Island, across the street from Carol Sanders Beatty, who lived in a duplex at 231 Broadway Street. Over the two years that they were neighbors, Beggs and Beatty increasingly socialized with each other. Petitioner had infrequent social contact with Beatty, although they were on friendly terms.

On May 30, 1986, at approximately 4:30 p.m., petitioner and Beggs went to a local bar, the Sandpiper, where petitioner had several glasses of beer. They left the bar at around 5:15 p.m., and after purchasing Chinese take-out at Ping's Restaurant and a bottle of vodka at a local store, they went home for dinner. After dining and consuming several Bloody Marys, they went across the street to visit Beatty. They arrived at around 8:30 p.m., carrying the bottle of vodka and some Bloody Mary mix with them. While Beatty and Beggs talked – mostly about the problems Beatty was having with her husband locked up in a Florida prison for dealing drugs – petitioner and Beggs had several rounds of Bloody Marys, consuming most of the vodka in the process.[5]

Petitioner left Beatty's residence around 9:30-10:00 p.m, announcing that he

---

[5] As Beatty was telling Beggs about her situation, Beatty's husband called from the prison, and talked to Beatty and briefly to petitioner.

was going home to bed because he had to get up early the next morning to bid a construction job. Beggs stayed and continued the conversation with Beatty. Petitioner went home, but did not retire for the night. Instead, he packed some clothes and other household items in his pick-up truck and drove to a pier on St. Simon's Island, where he struck a parked vehicle and immediately fled the scene. He abandoned his pick-up truck on Forest Park Drive, several blocks from his Broadway Street residence, and headed on foot to Beatty's residence. The owner of the vehicle petitioner had struck, Donald Sanders, had witnessed the collision and called the police. While these events were unfolding, Beggs remained at Beatty's. She left at around 11:00 p.m. After she got home, she discovered that petitioner was not there. Neither was his truck.

Beatty was in her front yard when she and Beggs parted company. Bonnie Smith, who lived in the other half of the duplex at 231 Broadway Street, was there too. Beatty and Smith visited for a few minutes; both then retired for the night. It was approximately 11:15 p.m.

Shortly after the two women returned to their residences, petitioner entered Beatty's backyard. Petitioner described what happened next in his confession to the police on May 31, after he had been taken into custody. He called to Beatty, asking her to come outside. Beatty came out and petitioner attempted to kiss her.

6

She refused, and told him to go home or she would tell Beggs. Petitioner again attempted to kiss her, and she scratched and slapped him. According to his post-arrest confession to the police, he then "grabbed her and I threw her down and somehow the knife came in my hand and started stabbing her, I don't know, I just lost [sic] out of control . . . I was drunk, I don't know why I did it. I had no reason for it." Petitioner stabbed Beatty in the throat and the abdomen, using a pocket knife that he regularly carried. During the assault, Beatty screamed and called for help. When she collapsed, he ran home, discarding the knife as he ran, washed himself off with a hose in his backyard, put on a new pair of jeans, and entered his house.

At 11:22 p.m., Glynn County Police Department Detectives Barry Moore and James Brundage received a report of a woman screaming in the Broadway Street neighborhood. While they were responding to the call, they received a call from Bonnie Smith, who told them that a woman was screaming in her backyard, behind her residence at 231 Broadway Street. They drove to that address, heard someone run through the backyard, and gave chase. In the course of their pursuit, Brundage discovered petitioner's pick-up truck parked nearby on Forest Drive. The truck matched the description of the vehicle involved in the hit and run Sanders had reported.

Unable to find the person they were chasing, the detectives returned to Beatty's residence. Brundage found Beatty in the backyard, laying in the garden, and still alive. Paramedics were summoned and transported Beatty to Glynn-Brunswick Memorial Hospital. According to Dr. Irwin Berman, one of her treating surgeons, Beatty had

> a slash wound [in] her neck, which had exposed the entire cross section of her windpipe . . . In addition to that, she had multiple wounds of her great vessels of neck . . . There were smaller wounds of the flank . . . and a stab wound of the abdomen through which . . . some of the organs of the, of the abdomen were protruding.

After Beatty had been taken to the hospital, petitioner, dressed in jeans but without a shirt or shoes, entered his house through the backyard. Beggs was awake. She noticed scratches on his face and chest. When she asked about them, petitioner told her that he fell in some bushes on the way back from Beatty's.[6] Beggs then observed the flashing lights of police cars across the street, at Beatty's, and went over to find out what had happened. She learned that Beatty had been attacked and taken to the hospital.

Beggs returned home and told petitioner that "something terrible had happened to Carol." Petitioner told her "he didn't do it." He asked Beggs to find

---

[6] Beggs recounted this episode during her testimony as a prosecution witness at petitioner's trial.

his truck, because he could not remember where he had left it, and attempted to crawl into a small attic space, telling Beggs he was going to hide. Beggs, increasingly distraught at petitioner's bizarre behavior, left the house in an attempt to find the truck. She also wanted to get away from petitioner, to collect her thoughts.

Beggs drove by Beatty's duplex for a minute or two, searched the neighborhood for petitioner's vehicle and, failing to find it, drove to a local convenience store to purchase cigarettes. After that, she drove to the same pier petitioner had headed for earlier, to have a smoke and collect her thoughts before returning home.

At around 12:15 a.m., Dr. Berman noticed that Beatty was mouthing words, apparently in an attempt to communicate. He notified Detective Greg McMichael, who was standing by, and McMichael came to her bedside. The Georgia Supreme Court, in Newland v. State, related what followed:

> McMichael . . . asked the victim who had attacked her and read her lips to say the name, 'Bob.' He then sounded out the name, 'Bob' and asked the victim if this was correct. She nodded her head affirmatively. When asked the last name of her assailant, the victim mouthed a word McMichael could not understand. He then asked the victim if the name began with an 'A.' She shook her head negatively. McMichael proceeded in this manner through the alphabet until he asked about the letter 'N.' The victim 'nodded her head vigorously' and squeezed his hand. By this procedure McMichael was able to elicit affirmative shakes of the head from the victim to the

9

letters, 'N E W L A.' McMichael then asked the victim if the last name was 'Newland.' The victim 'nodded her head again very vigorously,' and squeezed McMichael's hand.

366 S.E.2d 689, 692–93 (Ga. 1988).

In like manner, Beatty was able to give McMichael petitioner's phone number and the name of the street where he lived. Relying on this information, the Glynn County Police Department dispatched several officers, including Detectives Bill Williams and Dennis Krauss, to petitioner's residence. They arrived at 1:10 a.m. and found petitioner sitting up in his bed and pulling on a pair of jeans, as if he had just awakened. They placed petitioner under arrest for aggravated assault and transported him to the police department headquarters in nearby Brunswick.

Beggs came home shortly after the police left with petitioner. Several officers were still there, and they asked her, and she agreed, to accompany them to the headquarters. She was not under arrest.

B.

At some point early that morning, on May 31, the police obtained a search warrant for petitioner's residence. They found a blood-stained shirt and a pair of socks on the back porch, and a pair of blood-stained blue jeans in a shed in the backyard.

At 1:30 a.m., Detective Williams questioned petitioner in an interview room at the police department headquarters.[7] Williams was the only officer present. Petitioner smelled of alcohol but his speech was not impaired.

Williams began by informing petitioner of his <u>Miranda</u> rights. He then asked petitioner what he had done the previous evening. Petitioner said that his truck had broken down early in the afternoon and that he had left it on Forest Park Drive. Later that afternoon, he had gone to the Sandpiper bar with Beggs, had three glasses of beer, picked up Chinese food at Ping's Restaurant, and gone home for dinner. After dinner, they went over to Beatty's place, where he and Beggs had several Bloody Marys. At around 8:30 p.m., they left Beatty's to go home. On the way, he stumbled, because he had been drinking "quite a bit," and fell in some bushes, which accounted for the scratches on his face. Once home, he went to bed and fell asleep. Beggs awakened him to say that the police were at Beatty's. He told her that this was the neighbor's problem and went back to sleep. He was sleeping when the police arrived to arrest him. Williams asked petitioner if he had gotten drunk that evening; he replied that he had been drinking, but was not drunk. Petitioner asked Williams why he was being questioned – whether he

---

[7] This interrogation was recorded and the transcript thereof was used by defense counsel in cross-examining Williams at trial.

had been charged with anything.[8]  Williams gave no answer.

The interrogation lasted about half an hour.  Around 2:00 a.m., the police had his blood alcohol content ("BAC") tested.  Officer Richard Strickland performed the test, which revealed a .12 percent BAC.  Petitioner was placed in a holding cell following the test.

While petitioner was submitting to the BAC test, Williams began questioning Beggs, who had arrived at the headquarters (as Williams was questioning petitioner).[9]  This interrogation began approximately at 2:00 a.m. and was broken into two sessions, which combined lasted no more than two hours.[10]  Williams began the first session by informing Beggs that she was not under arrest.  He then asked her to tell him what had transpired the previous evening up to the moment she arrived at the department headquarters.  Beggs's account of the first part of the evening was consistent with the account petitioner had provided Williams.  She stated that they had gone to a local bar, picked up Chinese food,

---

[8] The police had already placed petitioner under arrest for aggravated assault, but petitioner apparently was oblivious of that fact.

[9] As indicated in the following text, the police questioned Beggs, in two sessions, between 2:00 and 3:30 a.m. that morning, and again from 9:00 a.m. till noon the same day, at which time she was placed under arrest for aggravated assault.

[10] Williams was the only officer present during the two sessions.  Both were recorded, and a  transcript thereof was made part of the record of the superior court hearing on petitioner's post-conviction petition for a writ of habeas corpus.

gone home to eat, and then gone over to Beatty's.

At this point, her account began to diverge from petitioner's. She stated that petitioner left Beatty's before she did and that when she returned home, she saw petitioner lying in bed. Moments later, she saw police lights flashing at Beatty's and went there to find out what had happened. She learned that Beatty had been stabbed and hastened home to tell petitioner. He was asleep and did not respond. She went back to Beatty's because she was concerned about her friend and wanted to learn more. After a brief conversation with a police officer, she drove to a local convenience store to purchase cigarettes and from there to the St. Simon's Island pier. Distraught about Beatty's situation, she stayed at the pier for a few minutes, smoking and trying to calm down. She returned home only to find the police waiting. Williams asked her if she had observed any scratches on petitioner, and she said that she had not.

Williams confronted Beggs with the inconsistencies between her account and petitioner's. He pointed out the contradictions concerning whether they returned from Beatty's together or separately and whether petitioner had scratches on his face. Williams asked her if she was lying; she denied it. The first session ended with Williams telling Beggs to sit down on a couch outside the interview room and "think about everything again," warning her that she would "go down

with [petitioner]" if she was trying to cover up for him.

A short time later, Williams resumed the questioning. Beggs admitted that she had not actually seen petitioner at home when she returned from Beatty's but had assumed he was there, telling Williams, "that's the part I covered up." She explained that after she returned to her house, she saw the flashing police car lights at Beatty's, walked over there and then back home, at which point she saw petitioner in the bedroom and they talked. She admitted that during this conversation, she saw scratches on his face and asked him what had happened. He said he had fallen.

Williams challenged Beggs's account and told her that Beatty had identified petitioner as her attacker. He asked Beggs if she was sure about her story and reminded her that "this is your friend laying out there in the garden." Beggs, reconsidering, told Williams that she had not seen petitioner at home – after she crossed the street to inquire about the police car lights. He did not arrive until later, when he entered the house from the backyard. It was then that they talked about the scratches on his face. Williams asked her about the knife used in the attack on Beatty. He accused her of disposing of the knife to protect petitioner. Beggs denied doing anything with the knife. The interrogation ended around approximately 3:30 a.m. Beggs was taken to a waiting area at the police

14

headquarters where she sat for the next two hours.

At 3:50 a.m., Williams resumed questioning petitioner after advising him of his Miranda rights.[11] Williams began by asking petitioner to recount again the events of the previous evening. Petitioner repeated what he had told Williams earlier, but stated that after he left Beatty's, he drove off in his pick-up truck to go to the store, but the truck had "died" on Forest Park Drive. He left the truck there, returned home, and went to sleep. Beggs awakened him later. Williams asked petitioner whether his truck died during the evening hours or in the afternoon, and petitioner stated that it died that evening. Once again petitioner asked Williams why he was being questioned. Williams said he was being questioned because he had attacked Beatty, and confronted him with the inconsistencies between his story and Beggs's. He told petitioner that a bloody shirt and pair of pants had been found at his residence. Petitioner responded to Williams's accusation that he had attacked Beatty by stating, "I have no idea, no remembrance, if I did anything like that."

Petitioner reinforced this statement by repeatedly saying that he had no memory of attacking Beatty. He attributed this to the quantity of vodka he had

---

[11] Williams was the only officer present during the interrogation. The interrogation was recorded.

consumed; he was not used to consuming that amount of alcohol. Williams challenged petitioner's no-memory claim as inconsistent with the rest of petitioner's account of the evening. He asked petitioner how he could remember falling in the bushes and conversing with Beggs after they got home, but not remember the attack. Although he had previously told Williams about his conversation with Beggs, he said he could not recall it. He could not explain why he remembered falling in the bushes.

Williams attempted to prod petitioner's memory by confronting petitioner with the possibility that "if that girl dies, you [will be] charged with murder" and Beggs will be charged as an accessory to murder.[12] Their first exchange involving Beggs went as follows:

> WILLIAMS: You remember enough to lie about it. You remember enough to lie about it and you don't even care enough about Peggy, her ass is going to jail.
> PETITIONER: I do care about Peggy.
> WILLIAMS: . . . her ass is going to jail, too.
> PETITIONER: For what?
> WILLIAMS: For accessory.
> PETITIONER: Accessory to what?
> WILLIAMS: To murder.

In their second exchange about Beggs, Williams was more specific about

---

[12] Williams prefaced this statement with this remark: "[T]hat girl is almost dead . . . if they don't get enough blood in her she is going to die."

16

the basis for potential charges against Beggs:

> PETITIONER: I was in my bed when y'all came.
> WILLIAMS: Yea, but you hadn't been asleep. You hadn't been in bed very long at all, I know that for a cact [sic]. Well, I think Peggy carried that knife off and hid it for you. Because the knife has disappeared.
> PETITIONER: Are you thinking that or do you know that?
> WILLIAMS: No, I think that she, you know, and my boss wants to charge her as an accessory, so you know, if you know where the knife is, if you don't want her to go to jail . . .
> PETITIONER: . . . I have no idea, I have no idea, I'm just being straight with you, I just don't know.

The prospect of Beggs being charged as an accessory to murder did not cause petitioner to alter his account of the evening; he continued to claim that he did not remember attacking Beatty. The interrogation ended at approximately 5:00 a.m.

A short time after petitioner's second interrogation ended, Williams escorted petitioner to a rest area within the headquarters building, where petitioner was allowed to speak with Beggs in Williams's presence. Their conversation lasted less than ten minutes. Petitioner told Beggs that he could not remember what had happened that evening.

After this, Beggs returned to a waiting area. At around 6:00 a.m., the police informed her that she could leave, and a sister picked her up at around 6:20 a.m. During the interim, petitioner was taken to the Glynn-Brunswick Hospital, where

17

his blood was drawn at 6:55 a.m. for its BAC and blood type. The police then transported petitioner to the Glynn County Detention Center.

Later in the morning, the Detention Center contacted a local mental health hospital that provided emergency psychiatric services for the Center and requested that someone evaluate petitioner. Frederick Dodd, Jr., Ph.D., a psychiatric social worker, who was on-call, met with petitioner for roughly an hour. Petitioner appeared to Dodd to be "extremely tearful," "pretty agitated," and "very confused." At Dodd's request, the Detention Center placed petitioner on suicide watch.[13]

Police officers brought Beggs back to the police headquarters around 9:00 a.m., where she was questioned for the next several hours. At noon, she was arrested for aggravated assault and taken to the Detention Center.

At 9:35 p.m., on May 31, Beatty died from excessive blood loss caused by the injuries she had suffered. The following morning, June 1, at around 10:00 a.m., Detectives Krauss and Putnam went to the Detention Center in order to inform petitioner that Beatty had expired and that he was now being charged with

---

[13] Dodd's report of his interview with petitioner states: "suicidal watch recommended and instituted by officers." There is no other reference in the record to the suicide watch or when it was lifted.

18

murder.[14]  Petitioner was escorted from his cell out to a holding cell to meet with

the detectives.[15]  Before Detective Krauss began speaking to petitioner, petitioner

stated: "I just want to plead guilty and get out of town."  Krauss instructed

petitioner not to say anything else and advised him of his Miranda rights.

Petitioner signed a form waiving those rights.  Krauss then asked petitioner to tell

him what happened the night of May 30.  Petitioner, despite his expressed desire

to plead guilty, said nothing inculpatory.  Instead, he told Krauss that he did not

remember assaulting Beatty and did not want to continue talking.  Krauss

informed petitioner that Beatty had died and that he was being charged with

murder.  Petitioner became upset and started to cry, but did not make any

inculpatory statements.  Since petitioner had stated he did not wish to continue

talking, Krauss asked that he be taken back to his cell.  As petitioner was being

escorted out of the holding cell, he asked Krauss about Beggs's status.  Krauss

told him that Beggs was in the Detention Center and that he was about to inform

---

[14] The detectives carried a tape recorder with them, to record the encounter, but the recorder malfunctioned.  The sole account of what transpired between them and petitioner was given by Krauss – at the January 21, 1987 pretrial hearing on petitioner's motion to suppress his statements to the police and, later, at petitioner's trial.

[15] At the January 21, 1987 pretrial hearing, Detective Krauss described the holding cell as follows: "It's not a very big place.  It has bars between the officers and the prisoners, and it's pretty much a private place, and usually that's where we go and question someone that's in the Detention Center being held if we have anything to talk to them about."  The cell was located on the third floor of the Detention Center.

19

her that she also was being charged with murder. Petitioner then confessed to killing Beatty.

Petitioner stated that Beggs was not with him when he went to Beatty's backyard the night of May 30. According to Krauss, petitioner said that he "tried to kiss her that, that she pushed him away, and they got into a struggle, and he got very angry about it. He . . . hit her and then threw her to the ground. He . . . pulled out his knife and just started cutting her." Krauss asked him where the knife was, and he said he could not remember. Petitioner cried as he recounted the assault and expressed his remorse. The confession, including Krauss's questions, lasted for ten to fifteen minutes.

Krauss informed Williams of petitioner's confession. Because the confession had not been recorded, Williams decided to visit petitioner to have him repeat his confession. Accompanied by Detective McMichael and armed with a recorder, he went to the Detention Center to speak with petitioner. At 1:05 p.m., Williams and McMichael spoke with petitioner in an interview room. Williams informed petitioner of his Miranda rights, and petitioner signed a waiver-of-rights form. Petitioner again confessed to the murder. But it was not recorded; the

20

recorder's batteries had expired.[16]

Realizing that the confession had not been recorded, Williams went to see petitioner again, at 11:10 a.m. the following day, June 2. He came alone, but this time he brought a functioning tape recorder. As he had done on the previous occasions, he informed petitioner of his <u>Miranda</u> rights. He did not ask him to sign a waiver-of-rights form, opting instead to have petitioner verbalize a waiver through the tape recorder. The interrogation lasted for fifteen minutes. Williams asked petitioner to repeat what he had told him the previous day, and petitioner did so, giving a detailed statement of his involvement in the killing. The statement was recorded and transcribed and published to the jury.

In his statement, petitioner essentially repeated what he had told Detective Krauss on June 1. He also stated several times that he lost control and attacked Beatty because he was intoxicated. He explained that after stabbing Beatty, he ran home, washed himself off in his backyard, changed clothes, and then entered the house, where he spoke with Beggs. She asked him what had happened and how his face had gotten scratched. He told her nothing had happened. "[S]he went over next door, the next thing I remember I was being arrested." He claimed that

---

[16] Like the confession to Krauss, this confession was not recorded. Petitioner has not alleged any improper conduct by officers during these two unrecorded interrogations.

he did not remember getting into an accident with his pick-up truck and what he had done with the knife. Petitioner expressed remorse throughout the interrogation.

On June 3, Beggs, now represented by counsel, gave an affidavit to the police describing petitioner's behavior on May 30 – 31. In exchange for the affidavit, the State reduced her charge from murder to giving a false statement to law enforcement officials. And that charge was eventually dropped.

## II.

### A.

On June 4, Donald Manning, the Glynn County Public Defender, met with petitioner at the Detention Center. Petitioner was indigent, and Manning informed him that he was appointed to represent him.[17] Under Georgia law, petitioner,

---

[17] Manning was born and raised in Glynn County. He left the county in 1971 to pursue educational and employment opportunities and returned in 1978. He became an assistant public defender for Glynn County in 1979. In May 1983, he became the Public Defender. Manning was appointed a Glynn County juvenile judge in 1988. He was serving in that position at the time the superior court heard petitioner's application for writ of habeas corpus challenging his convictions and death sentence in the Beatty case.

Prior to petitioner's trial, Manning had served either as lead or assistant trial counsel or appellate counsel in nine capital cases in Georgia. Of these nine cases, he served as lead trial counsel in one case that went to trial and two other cases disposed of by plea-bargained guilty pleas. Before taking on petitioner's representation, Manning had tried, as defense counsel, 57 felony cases.

John Davis, an assistant public defender, assisted Manning in preparing for petitioner's trial but did not attend the trial. Davis had been a trial lawyer, a superior court judge for Lafayette County, Georgia, and a member of the U.S. House of Representatives from Georgia. He had moved to St. Simon's Island and become an assistant public defender following his

having been detained without bail, was entitled to a commitment hearing.[18]

Because a commitment hearing gives the accused an opportunity to discover the essence of the State's case, Manning, on June 10, informed the assistant district attorney handling the case, Robert Crowe, that he would be requesting a commitment hearing. Crowe replied that a grand jury would be convened the next day and would consider the Beatty case, and that if petitioner were indicted, a preliminary hearing would be unnecessary. Crowe nonetheless agreed not to oppose Manning's request for a preliminary hearing.

On June 11, the grand jury returned a five–count indictment against petitioner, charging him with malice murder, aggravated assault with intent to rape, aggravated assault with a deadly weapon, and two counts of felony murder predicated on the aggravated assault charges. On July 1, the Glynn County Magistrate Court held a commitment hearing.

To show that the State had probable cause to detain petitioner for the Beatty

---

congressional service.

[18] Georgia law provides that an arrestee who has not been released on bail may request a commitment hearing to determine whether probable cause exists to hold him on the charge for which he has been arrested. See O.C.G.A. § 17-7-20 (1980); Lamberson v. State, 462 S.E.2d 706, 708 (Ga. 1995). The commitment hearing can also serve an important strategic function for the defendant because it provides defense counsel with the opportunity to obtain discovery in the early stages of pretrial preparation. See Jack Goger, Georgia Criminal Trial Practice § 11–2 (2007). At the hearing, defense counsel may subpoena witnesses and question them under oath. O.C.G.A. § 17-7-28 (1973).

assault, Crowe presented the testimony of three witnesses: Bonnie Smith, Beatty's

next–door neighbor, and Detectives McMichael and Williams. Smith testified

about calling the police after hearing a woman screaming in Beatty's backyard

and seeing what appeared to be a man, whom she could not identify, running

away. Manning cross-examined her about the relationship between Beatty and

petitioner. Smith described the relationship as one of friendly neighbors.

McMichael told of being summoned to Beatty's hospital bed and Beatty's

identification of petitioner as her assailant, and Williams described his

interrogation of petitioner and the incriminating content of petitioner's statements.

Manning cross-examined both detectives; in doing so, he learned of other

incriminating evidence the police had obtained. The commitment hearing ended

after Williams finished testifying.[19]

On October 21, the Glynn County Superior Court judge convened an "initial

pretrial proceeding," as required by the Georgia Unified Appeal Procedure

("UAP").[20] Judge Blenn Taylor, Jr., presided and handled the case to its

---

[19] The record does not indicate whether, at the conclusion of the commitment hearing, the court found probable cause to detain petitioner. The grand jury indictment had rendered such a finding unnecessary.

[20] The UAP, established in 1980, prescribes certain procedures for the pretrial, trial, sentencing, and appeal stages of capital cases. See O.C.G.A. 17-10-36 (1980); Smith v. Zant, 887 F.2d 1407, 1415 n.19 (11th Cir. 1989) (en banc). The UAP requires the trial court to conduct at least two pretrial hearings: the "initial pretrial proceeding," which takes place prior to

conclusion. Crowe, appearing for the State, announced that the State would seek the death penalty and provided Manning with written notice in accordance with O.C.G.A. § 17-10-30 (7).[21] Following the UAP format, the court instructed Manning that he must "locate and interview all persons whose testimony might be helpful in . . . mitigation of the punishment" and he acknowledged that such was his responsibility as defense counsel. When the initial pretrial proceeding concluded, the court arraigned petitioner.

On November 10, Manning filed twenty motions. Among them were a motion to suppress the statements petitioner gave the police and requests for discovery, including a list of the witnesses the State intended to call in its case in chief. On January 15, Manning moved the court for the appointment of a psychiatrist and a neurologist to examine petitioner to determine both his

---

the arraignment, and the "motion hearing," at which all motions are heard. Unified Appeal Procedure, Rule II(C)-(D). The UAP also establishes a "Checklist," which enumerates legal errors that might occur at each stage of the prosecution and thus form the basis for an appeal. The trial judge must review the "Checklist" with counsel at the pretrial hearings and at trial. In addition, at the pretrial hearings and during the guilt and penalty phases of the defendant's trial, the judge must question the defendant regarding his satisfaction with trial counsel's performance. In petitioner's case, the court questioned petitioner as the UAP required, and at no time did he voice any objection to Manning's representation.

[21] Section 17-10-30(7) authorizes the death penalty if the jury concludes that "the offense of murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim."

25

competency to stand trial and his sanity at the time of the offense.[22]

The court heard Manning's motions on January 21, 1987. Arguing his January 15 motion, Manning told the court that he wanted a neurological (as well as a psychiatric) examination because he had reason to believe that petitioner had a "neurological disorder."[23] If Georgia Forensic Services ("GFS") could not provide a neurological examination, he said, he would request that petitioner be seen by William Clary, M.D., a neurologist in private practice in Savannah, Georgia. The court granted Manning's motion in full.

After Crowe agreed to provide Manning with the discovery he requested, the court turned to Manning's motion to suppress petitioner's statements to the police and asked counsel if they were ready to proceed with an evidentiary hearing. They responded that they were ready to go forward.

Crowe called Detectives Williams and Krauss to the stand. They testified that petitioner had been informed of his Miranda rights at the time of his arrest and

---

[22] Specifically, pursuant to O.C.G.A. §§ 16-3-2 and 16-3-3, Manning requested an examination to determine if petitioner, at the time he assaulted Beatty, "did not have the mental capacity to distinguish between right and wrong" or suffered from "a delusional compulsion as to the act which over-mastered his will to resist committing the crime."

[23] At the evidentiary hearing on petitioner's post-conviction application for a writ of habeas corpus, Manning testified that he requested the neurological exam because petitioner had complained to the Detention Center physician of headaches; Manning believed that the headaches might constitute a symptom of an underlying neurological disorder.

26

at each interrogation, that he waived his rights before questioning commenced, that he had not been threatened or promised anything in exchange for his statements , and that he gave no sign of mental impairment.  In examining Williams about the two interrogations he conducted on May 31, Crowe focused on the degree of petitioner's intoxication.  Williams stated that while petitioner did appear to have been drinking, his answers were responsive and he was steady on his feet.  Krauss told Crowe that petitioner did not confess until after he asked about Beggs and had been informed of his rights.

Manning cross-examined both witnesses.  In questioning Williams, he concentrated on what Williams said to petitioner while interrogating him – twice on May 31 and once on June 1.  Referring first to the May 31 interrogations, Manning asked Williams about the extent of petitioner's intoxication, and Williams repeated what he told Crowe on direct-examination.  Manning asked him whether petitioner expressed "concern" about Beggs's status in the investigation, and he said that petitioner seemed concerned.[24]  Turning to June 1, when, following Beggs's arrest for murder, Williams took petitioner's statement,

---

[24] In questioning Williams about his interrogation of petitioner at 3:50 a.m. on May 31, Manning did not ask him about two comments he made about Beggs: specifically, "her ass is going to jail . . . for accessory . . . to murder," and "my boss wants to charge her as an accessory." Manning's failure to bring these two comments to the trial judge's attention forms the basis for petitioner's claim that Manning's challenge to the validity of petitioner's confession was constitutionally inadequate.

Manning asked him if he told petitioner that Beggs would get the death penalty if petitioner did not confess. Williams said no.

Manning questioned Krauss regarding his interrogation of petitioner on June 1 and petitioner's emotional status at that time. He also put to Krauss the same question he had asked Williams: whether he told petitioner that Beggs would get the death penalty if he refused to confess. Krauss said he did not.

After hearing from these witnesses and considering argument of counsel, the court overruled Manning's motion to suppress, finding that petitioner's statements had been freely and voluntarily made after a waiver of rights. The court then announced that petitioner's trial would commence on April 27, 1987.

B.

On January 23, 1988, Dominic D'Alesandro, Ph.D., a forensic psychologist in the employ of GFS, interviewed petitioner at the Detention Center pursuant to the court's order granting Manning's motion for a psychiatric examination. D'Alesandro submitted a report to the court and counsel on January 27, in which he concluded that petitioner was competent to assist counsel in his defense, but deferred any opinion as to petitioner's criminal responsibility for the charged offenses until petitioner was evaluated by a neurologist.

On February 16, petitioner was examined by Dr. Clary, who subsequently

28

issued a report.[25]  In it, he stated that he had "been asked to see [petitioner] for evaluation of headaches."  He discussed petitioner's background and the head injuries petitioner had suffered in the past.  Regarding the latter, he indicated that petitioner had been struck in the head with a sledge–hammer and had injured his head in a car accident that resulted in a loss of consciousness for several hours.  Dr. Clary also stated that petitioner said he had not "had beer for several years, although he used to drink apparently fairly heavily, [and] that prior to six years ago he was using drugs fairly consistently, but eventually stopped."  Dr. Clary concluded that petitioner was suffering from "chronic muscle tension headaches . . . [but] doubt[ed] that there is any more significant underlying neurological problems."  Nonetheless, he ordered an electroencephalogram ("EEG") and computed tomography ("CT") scan if petitioner's headaches did not diminish.  On March 24, the EEG and CT scan were conducted.  Neither revealed any sign of neurological injury.[26]

On April 2, petitioner was examined by Richard Doss, M.D., a forensic psychiatrist in the employ of GFS, at Georgia Regional Hospital.  On April 10, Drs. Doss and D'Alesandro issued a joint report, which was sent to the court with

---

[25] The report was sent to the court, with copies to GFS and counsel for the parties.

[26] The results of the EEG and CT scan were provided to the court, GFS, and counsel for the parties.

29

copies to counsel. The report concluded that "there were no indications to suggest the existence of a psychiatric, psychological, or neurological disorder which could conceivably have been a factor in his behavior during the night of the alleged murder with which he is charged." The report also noted that petitioner "maintain[ed] that he was unable to remember the specific episode which resulted in the charges," but, nonetheless, "demonstrated a significant remorse for the situation."

## C.

On July 31, the prosecutor provided Manning with notice that he would be seeking the death penalty under O.C.G.A. 17-10-30 (2) as well as subsection (7).[27] On August 7, three days before petitioner's trial was to commence, the prosecutor filed notice that he intended to present a prior indictment of petitioner as a non-statutory aggravating factor at the sentencing hearing, should petitioner be convicted.[28] Petitioner had been indicted in December 1978 in Tennessee for

---

[27] Section 17-10-30(2) authorizes the death penalty if the jury concludes that "the offense of murder, rape, armed robbery, or kidnapping was committed while the offender was engaged in the commission of another capital felony or aggravated battery, or the offense of murder was committed while the offender was engaged in the commission of burglary or arson in the first degree."

[28] Pursuant to O.C.G.A § 17-10-30(b), the jury is authorized to consider "any mitigating circumstances or [non-statutory] aggravating circumstances otherwise authorized by law." The prosecutor probably intended to introduce the indictment as a non-statutory aggravating circumstance, going to the defendant's general moral character. See Ford v. State, 360 S.E.2d 258, 260 (Ga. 1987) ("The factors normally considered in sentencing are (1) the character of the

aggravated assault, burglary, and criminal sexual conduct in the first degree. The victim of these alleged offenses was a woman. Manning objected to the prosecutor's use of the indictment, and the court sustained his objection.[29] Manning, however, successfully persuaded the court not to allow this indictment to be used at the sentencing hearing.[30]

D.

1.

Petitioner's trial, which had been set for April 27, 1987, began on Monday, August 10, 1987.[31] It lasted five days. The State called twenty-two witnesses in its case in chief during the guilt phase of the trial. The testimony of these

---

defendant, including his previous criminal activity, if any, and (2) the circumstances of the crime on trial.").

[29] While petitioner was on the stand during the penalty phase of his trial, the prosecutor, believing that the court's pretrial ruling precluding the use of the indictment as a non-statutory aggravating factor did not bar him from using it to impeach petitioner, asked him whether he had ever been to Munesforo, Tennessee, and he said no. Manning objected. During the court-counsel colloquy that ensued (out of the hearing of the jury), the prosecutor explained to the court that, following the indictment, petitioner had been admitted to bail by posting a bond. He had skipped bail, become a fugitive, and forfeited his bond. The court sustained Manning's objection, and the jury never learned about the sexual assault that allegedly had occurred in Tennessee eight years before.

[30] There is nothing in the record indicating why the trial judge decided not to allow admission of this indictment.

[31] The trial was postponed for reasons not pertinent to this habeas proceeding.

31

witnesses established the facts set out in subpart I.A, supra.[32]  In addition to these facts, their testimony established that the victim's blood was present on petitioner's jeans and shirt.[33]  Anticipating Manning's defense – that petitioner's level of intoxication diminished the mens rea necessary for a malice murder conviction – the State introduced evidence of what it contended was a minimal level of intoxication through the testimony of Sally Watford, a Georgia Bureau of Investigation forensic scientist.  She testified that petitioner's BAC was .04 percent when his blood was drawn at Glynn-Brunswick Hospital at 6:55 a.m. on May 31.  Extrapolating back seven hours, using an average alcohol dissipation rate, she testified that petitioner may have had a BAC of .14 percent around midnight on May 30.

Manning's defense strategy was to portray petitioner as a normal guy, a hard worker who had an excellent reputation as a dependable drywall contractor, a good and friendly neighbor, and a person who used alcohol in moderation.  On the evening of the crime, petitioner drank, for him, an excess amount of alcohol, and

---

[32] The evidence the State presented did not include what Beggs told the detectives on being questioned at the police headquarters on May 31 prior to being charged, at noon on that day, with aggravated assault.

[33] John Wegel, a forensic serologist employed by the Georgia Bureau of Investigation, stated that petitioner had Type A blood, that Beatty had Type O blood, and that the blood found on petitioner's jeans and shirt was Type O blood.

the alcohol caused him to act completely out of character. He had no reason to attack Beatty; he was not a violent person. Alcohol was the sole explanation for his conduct. The alcohol had such an effect on him that he could not form the mens rea required for malice murder.

Manning executed this defense strategy principally through his cross-examination of prosecution witnesses. Beggs related how much petitioner had to drink that evening. Petitioner had three to four beers at Ping's, the Chinese take-out restaurant, two Bloody Marys at their house before and during dinner, and three more over at Beatty's. By the time he left Beatty's, there was very little vodka left in the bottle. Beggs testified that she had not seen petitioner drink to the point of intoxication since February 1984, and that he was not normally a vodka drinker. When he left Beatty's, she said, "it was time" for him to go home.

Manning asked Detective Williams about petitioner's state of intoxication prior to the 1:30 a.m. interrogation on May 31. Williams said that petitioner had an odor of alcohol and that his eyes were bloodshot. Manning asked Watford to extrapolate back nine hours from the time petitioner's blood was drawn at the hospital, at 6:55 a.m. on May 31, and she said that petitioner's BAC was possibly .17 percent at approximately 10:00 p.m. the night before.

Manning questioned Bonnie Smith and Beggs about petitioner's lifestyle.

Beggs said that she and petitioner had a normal relationship and that he had been regularly employed since they moved to St. Simon's Island in 1984. Petitioner owned his own drywall contracting business, and left Beatty's around 10:00 p.m. because he had to get up early the following morning to bid on a construction job.

Smith testified that she saw no signs of animosity or of a sexual relationship between petitioner and Beatty. She went on to say that she, Beggs, petitioner, and Beatty had worked together on a garden in the backyard of Beatty's and her duplex. In a leading question, Manning characterized petitioner and Beggs thusly: "Just normal people concerned with a garden, that's basically how you knew them is that, that it?" She replied, "Right."

In addition to portraying petitioner as a friendly, caring person who had no reason to attack Beatty, Manning had to deal with the highly incriminating post-arrest statements petitioner had given to the police. His tack was to plant the idea with the jury that petitioner gave a false confession to protect Beggs and that his description of the crime was provided by the police as they interrogated him. He had Detective Williams admit that when he questioned petitioner at 1:30 a.m. and 3:10 a.m. on May 31, petitioner consistently claimed not to be able to recall any involvement in the murder, that he told petitioner that "[Beggs's] ass is going to jail, too . . . for accessory," that he was deeply concerned about Beggs's welfare,

34

and that during the 3:10 a.m. interrogation, he provided petitioner with several details about the crime.

In cross-examining Detective Krauss, Manning focused on the events surrounding petitioner's statements to him on June 1. Krauss testified that petitioner first claimed that he could not remember what happened and that he only confessed after being informed that Beggs had been charged with aggravated assault. Asked whether petitioner "was trying to do his best to protect Peggy Beggs," Krauss said that he was.

After the State rested its case, Manning presented the petitioner's case; he called two witnesses, Frederick Dodd, the psychiatric social worker who saw petitioner at the Detention Center the morning of May 31, and Officer Richard Strickland, who performed a BAC test around 2:00 a.m. that day. Dodd supported Manning's attack on the reliability of petitioner's incriminating statements. He testified that he visited petitioner after he had twice been interrogated by Williams, and that petitioner told him that he "could not believe that he had done what they said he had done." Dodd felt that petitioner's lack of memory could have been due to an alcoholic blackout. Strickland added to the blackout theory, albeit indirectly, by testifying that petitioner's BAC was .12 percent at 2:09 a.m. and was likely at a higher level earlier.

The defense rested; it was Friday, August 14. The State had no rebuttal, so the jury was excused while the court held a charge conference. Manning proposed a jury instruction that would allow the jury to consider petitioner's intoxication in its determination of criminal intent. Manning reminded the judge that he had given the same instruction in a case he had tried before the judge in December 1986. The judge acknowledged that he had given the instruction in that case, but stated that his view of the law regarding the relevance of voluntary intoxication in determining criminal intent had changed since that time.[34] Accordingly, he would not give the requested instruction; instead, he would submit an instruction to the jury that read, in part, "voluntary intoxication shall not be an excuse for any criminal act."[35] After the charge conference ended, the guilt phase of the trial resumed for counsel's closing arguments to the jury, beginning with the defendant's.

---

[34] The record does not indicate when the judge changed his view concerning the relevance of voluntary intoxication in resolving the issue of criminal intent. What is clear is that prior to petitioner's trial, the judge did not inform the parties that he had changed his view and thus would not give an instruction along the lines of the instruction he had given previously and, in particular, in the case Manning had tried before him in December 1986.

[35] The jury instruction on voluntary intoxication reads in full: "Our law provides that voluntary intoxication shall not be an excuse for any criminal act. It provides, further, that if a person's mind, when unexcited by intoxicants, is capable of distinguishing between right and wrong and reason and acting rationally and that person voluntarily deprives himself of reason by consuming intoxicants, and while under the influence of such intoxicants he commits a criminal act, he is criminally responsible for such acts to the same extent as if he were sober."

Manning first reminded the jurors that they would be required to find that petitioner murdered Beatty "with malice aforethought." He defined malice for them as the "deliberate intention unlawfully . . . to take away the life of another human being." He argued that Smith and Beggs had described petitioner as a hard worker, "a good neighbor," and "a good husband," and recalled Beggs's testimony that he had not drunk to the point of intoxication in several years. Petitioner got so intoxicated on the night of May 30, though, that, in Manning's words, "[he] did not even know what he was doing." For this reason, the jury was urged to find "ample doubt, more than a reasonable doubt, about malice aforethought, about intent to kill." Manning referred briefly to the aggravated assault with attempt to rape charge, saying that petitioner's attempt to kiss Beatty did not rise to the level of attempted rape.[36]

The prosecutor's closing argument, delivered by Crowe, summarized the extensive evidence of petitioner's guilt. Crowe downplayed the impact of petitioner's intoxication by arguing that petitioner was not too intoxicated to run from Beatty's backyard, clean himself off, lie to Beggs when she spoke to him

_____

[36] Manning's comments on the aggravated assault with a deadly weapon charge were likewise brief. The extent of his argument on that charge was: "Robert Newland is accused of five crimes, five, but I contend that you can conclude from the evidence that you've heard there is only one act, so you have to decide which, if any, of these alleged crimes was committed."

after he returned from attacking Beatty, and lie to Detective Williams in the initial interrogations. He relied heavily on petitioner's confession (to Detectives Krauss, Putnam, and Williams) to show that petitioner intended to assault Beatty with intent to rape, pointing to his statement that he tried to kiss her twice as evidence of intent to rape.

The case went to the jury on August 14 at 11:44 a.m. At 2:39 p.m., the jury returned its verdict. It found petitioner guilty of murder, aggravated assault with intent to rape, and aggravated assault with a deadly weapon. Following a short recess, the trial entered the penalty phase.

2.

The State sought the death penalty based on the existence of the two statutory aggravating factors indicated in the notices the prosecution had provided the petitioner. The State's case in chief was brief. Crowe waived his opening statement, and called no witnesses. To establish a non-statutory aggravating factor, he introduced and relied on documentary proof of petitioner's September 14, 1967 conviction in Florida for breaking and entering. He then rested the State's case.

Manning's strategy in presenting the petitioner's case was to focus on petitioner's lack of intent to kill Beatty. Part of this strategy was to show that

petitioner had a new-found religious faith and that he would dedicate his life in prison to ministering to fellow inmates.

Manning called five witnesses to the stand, then petitioner. Four of the five witnesses were either lay or ordained ministers who had visited petitioner during his incarceration. All testified that petitioner had experienced a genuine conversion to Christianity and could be an effective lay minister to inmates. Patty Parkinson, Beggs's sister, testified to petitioner's good character and that she had known him to be "very supportive, a generous kind man." He was "a passive type person. I never saw him angry."

Petitioner testified that he was committed to his faith and asked the jury to spare his life so he could minister to other prisoners. He pled for forgiveness, expressing sorrow for what he had done. He said that he had no intent to kill Beatty – in fact, he still had no memory of the attack. After he concluded his testimony, the defense rested, and counsel began their closing arguments.

The prosecutor's closing argument was largely an explanation of why the jury should find the requisite statutory aggravating factors. Crowe argued that Beatty's injuries were so extensive and severe that they constituted torture, such that the jury could find the existence of both of the statutory aggravating factors. Reminding the jurors that Beatty had screamed and begged for her life while

39

petitioner was assaulting her, Crowe asked them to show petitioner the same mercy he had shown Beatty.

Manning, in closing, argued that petitioner deserved life imprisonment. Petitioner did not intend to kill Beatty: "he doesn't even remember how he did it, certainly not why." He suggested that the attack on Beatty "appears from all the evidence . . . to be an isolated incident," for which petitioner had expressed great remorse. He urged the jury to spare petitioner's life so he could minister to other prisoners through sharing his religious faith.

The jury began deliberating over the penalty to be imposed at 5:26 p.m. on August 14. At 8:51 p.m., after the jury informed the court that it had not reached a verdict, the court recessed for the day. The jury resumed its deliberations on Saturday, the 15th, at 9:00 a.m. At 10:22 a.m., it returned its verdict. It found the existence of both statutory aggravating factors and recommended that petitioner be sentenced to death. The court, as required by Georgia law, adopted the recommendation and imposed a death sentence.

E.

1.

Petitioner appealed his convictions and death sentence to the Supreme Court

of Georgia, challenging the sufficiency of the evidence for the murder and

aggravated assault with intent to rape convictions and the admission of Detective

McMichael's testimony as to Beatty's identification of petitioner as her attacker.

He did not appeal the trial court's denial of his motion to suppress the statements

petitioner had made to the police. The Supreme Court of Georgia affirmed his

conviction. Newland v. State, 366 S.E.2d 689 (Ga. 1988). The United States

Supreme Court denied certiorari review. Newland v. Georgia, 488 U.S. 975, 109

S.Ct. 514, 102 L. Ed. 2d 549 (1988).

2.

On January 2, 1991, petitioner applied to the Superior Court of Butts

County, Georgia, for a writ of habeas corpus. The case lay dormant until

September 4, 1996. Petitioner amended his petition on November 12, 1997; as

amended, it contained twenty-five claims based on the Fourth, Fifth, Sixth, Eighth,

and Fourteenth Amendments of the United States Constitution and Article I,

Section 1 of the Georgia Constitution. The petition included the ineffective

assistance of counsel claims presented to us in this appeal. On March 3–4, 1998

41

and January 13, 1999, the superior court held evidentiary hearings, at which the petitioner submitted affidavits from various individuals in support of his claims but did not testify. The State called Manning to testify at the March 3–4 hearing. He was the sole State's witness. Petitioner's case consisted of several affidavits, none coming from petitioner himself.

The superior court denied petitioner habeas corpus relief in a one-sentence order on February 22, 1999. On June 5, 2001, the Georgia Supreme Court remanded the case to the superior court for findings of fact and conclusions of law. On December 17, 2001, the court issued an order that adopted the State's proposed findings and conclusions and again denied relief. The Georgia Supreme Court denied petitioner's application for probable cause to appeal on October 1, 2002. The Supreme Court denied certiorari review on May 5, 2003. Newland v. Turpin, 538 U.S. 1015, 123 S. Ct. 1933, 155 L. Ed. 2d 853 (2003).

3.

On September 22, 2003, pursuant to 28 U.S.C. § 2254, petitioner sought a writ of habeas corpus in the United States District Court for the Southern District of Georgia. His petition raised twelve claims, including the ineffective assistance

42

of counsel claims now before this court.[37] The petition was referred to a magistrate judge, who issued a report and recommendation on January 27, 2005, based on the records compiled in connection with the criminal prosecution and the state court habeas proceeding. The magistrate judge concluded that petitioner had failed to establish that the state courts had handed down a decision regarding any of his claims that entitled him to relief under 28 U.S.C. §. 2254(d). The district court adopted the magistrate judge's report and recommendation as its decision on June 16, 2005, and denied relief. Petitioner moved the court to alter or amend its judgment, pursuant to Federal Rule of Civil Procedure 59(e), on June 30, 2005. The court denied the motion on August 31, 2005.

On December 1, 2005, we granted a certificate of appealability to determine whether, as petitioner contends, (1) the performance of his trial and appellate attorneys, Donald Manning and John Davis, was constitutionally ineffective concerning the admissibility of his confession, and (2) Manning was ineffective in failing adequately to search for and present to the jury certain mitigating evidence during the penalty phase of the trial.

---

[37] Petitioner was granted leave to amend his petition to add one claim not pertinent to this appeal.

III.

A.

We review petitioner's ineffective assistance of counsel claims under the

standards established by 28 U.S.C. § 2254(d). Section 2254 was amended by the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No.

104-132, 110 Stat. 214, to ensure "greater federal court deference to state court

decisions and to promote more federal-state judicial comity." Wright v. Sec'y for

the Dep't of Corr., 278 F.3d 1245, 1244 (11th Cir. 2002). As amended, § 2254

reads:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State court proceedings
> unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court instructs that a state court decision is "contrary to"

established federal law if it "applies a rule that contradicts the governing law set

forth in our cases," or if the state court "confronts a set of facts that are materially

44

indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from our precedent." Williams v. Taylor, 529 U.S. 362, 405–06, 120 S. Ct. 1519–20, 146 L. Ed. 2d 389 (2000) (O'Connor, J., for the majority).

A state court's decision is an "unreasonable application of" established federal law if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 412–13, 120 S. Ct. at 1523. "Clearly established Federal law" consists of the "holdings, as opposed to the dicta, of the Court's decisions as of the time of the relevant state-court decision." Id.

Our review of a state court's findings of fact – to ascertain whether the court's decision was based on an unreasonable determination of facts – is circumscribed by both section 2254(d)(2) and 28 U.S.C. § 2254(e)(1), which states that: "a determination of a factual issue made by a State court shall be presumed to be correct," and that the habeas petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."

### B.

The Supreme Court established the test for establishing an ineffective assistance of counsel claim in Strickland v. Washington, 466 U.S. 668, 104 S. Ct.

2052, 80 L. Ed. 2d 674 (1984).  The test is two-pronged.  First, the petitioner must prove that his attorney's performance was deficient.  Second, the petitioner must show this deficiency prejudiced his defense, in that it "deprive[d] [him] of a fair trial, a trial whose result is reliable."  Id. at 687, 104 S. Ct. at 2064.

The petitioner satisfies the test's performance prong by proving that counsel's performance failed to meet the standard of "reasonableness under prevailing professional norms." Id. at 688, 104 S. Ct. at 2065; Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc).  Our evaluation of counsel's performance is highly deferential; we must  "indulge a strong presumption" that counsel's performance was reasonable and that counsel "made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 689–90, 104 S. Ct. at 2065–66.  We review counsel's performance "from counsel's perspective at the time," to avoid "the distorting effects of hindsight."  Id. at 689, 104 S. Ct. at 2065.  Our review is objective, in that we consider whether there was any reasonable justification for the attorney's conduct.  Chandler, 218 F.3d at 1315.  Thus, the "petitioner must establish that no competent counsel would have taken the action that his counsel did take."  Id.

The petitioner satisfies the Strickland test's prejudice prong by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the

46

result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. Where, as here, the petitioner contends that, but for counsel's errors, he would not have received a sentence of death, we consider "whether there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S. Ct. at 2068–69. With the foregoing principles in mind, we consider petitioner's ineffective assistance of counsel claims.

## IV.

In his state habeas petition, petitioner claimed that the performance of his trial and appellate attorneys, Donald Manning and John Davis, failed to pass Strickland muster in connection with the handling of his confession. Manning failed to present the trial judge with the evidence necessary to convince the court that petitioner's confession was involuntary and thus inadmissible;[38] Davis failed

---

[38] Petitioner has never contended that his confession was inadmissible on the grounds (1) that the police failed to inform him of his Miranda rights, or (2) that, having been informed, he did not voluntarily waive his right to silence or his right to the presence of counsel. Accordingly, the sole ground available to Manning in challenging the admissibility of petitioner's confession was that the confession was involuntary.

to appeal the court's ruling admitting the confession into evidence. We consider first the adequacy of Manning's performance, then turn to Davis's performance.

A.

On November 10, 1986, Manning moved to suppress the confession petitioner gave the police on June 1 and 2, 1986, following his arrest. The court considered the motion at an evidentiary hearing held on January 21, 1987.[39] Petitioner's ineffective assistance claim is rooted in Manning's performance at that hearing, specifically, in Manning's failure to introduce into evidence two statements Detective Williams made while interrogating petitioner at 3:50 a.m. on May 31. Petitioner claims that these statements constituted threats, impermissible police coercion. Had Manning introduced the two statements and explained their significance to the court, petitioner submits, the court would have found his confession involuntary and therefore inadmissible. To assess the validity of petitioner's position, it is necessary to review the events that led to petitioner's confession.

As indicated in subpart I.B, supra, petitioner was interrogated by the police on five occasions between 1:30 a.m. on May 31 and 11:10 a.m. on June 2, 1986. When questioned the first time, by Detective Williams at 1:30 a.m. on the 31st,

_____

[39] What transpired at the hearing is set out in subpart II. A, supra.

petitioner said nothing to implicate himself.[40] Williams questioned him again at 3:50 that morning. It was during that interrogation that Williams uttered the two statements at issue. Petitioner was worried about Beggs, whether she might be held criminally liable. Acting on this concern for Beggs and hoping that petitioner would confess for her sake, Williams told him that if Beatty died, he would be charged with murder and that Beggs's "ass [would be] going to jail, too . . . [f]or accessory . . . [t]o murder." Williams emphasized what lay in store for Beggs by adding: "[M]y boss wants to charge her as an accessory."[41] The prospect of Beggs being charged as an accessory did not prompt petitioner to confess, however. He stuck to the story he had given Williams at 1:30 that morning: he had no memory of attacking Beatty.

Petitioner's next encounter with the police occurred the following day, June 1. Beatty had died the previous evening, and at 10:00 a.m., Detectives Krauss and Putnam went to the Detention Center, with the intention of informing petitioner that he was being charged with murder. Before either Krauss or Putnam had a

---

[40] The interrogation was recorded. Manning received a transcript of the recording prior to the January 21, 1987 suppression hearing.

[41] The interrogation was recorded. Manning received a transcript of the recording prior to the January 21, 1987 suppression hearing. The record does not indicate whether the recording or transcript thereof was before the court when it ruled on the motion to suppress. We assume that neither piece of evidence was part of the record the court considered at that time.

chance to speak to petitioner, he blurted out: "I just want to plead guilty and get out of town."  Krauss told him to say nothing more and advised him of his Miranda rights.  After petitioner waived his rights, Krauss asked him what happened on the night of May 30.  He told Krauss that he did not recall assaulting Beatty, then refused to talk further.  As petitioner was being escorted out of the holding cell, however, he broke his silence and asked them about Beggs's status.  Krauss told him that Beggs was being charged with murder, too.  On hearing that, petitioner confessed to having assaulted Beatty.[42]  Krauss immediately informed Detective Williams of the confession.  Because the confession had not been recorded, Williams decided to get it on tape.  At 1:05 p.m. the same day, he and Detective McMichael saw petitioner, and he reiterated what he had told Krauss and Putnam.  When Williams subsequently discovered that the tape recorder had failed, he obtained another recorder and saw petitioner once again, at 11:10 a.m. the next day, June 2.  Petitioner repeated the confession he had given earlier.

Petitioner insists that his confession – given first to Krauss and Putnam and then twice to Williams – was coerced by Williams's threat to have Beggs charged as an accessory to murder unless he confessed.  He does so despite the fact that the

---

[42] The confession was not recorded.  See supra note 13.

threat did not induce him to confess on the spot[43] and that more than twenty-four hours passed before he actually confessed to Krauss and Putnam.

The state habeas court found no merit in petitioner's ineffective assistance claim. Although the court did not, in its dispositive order, explicitly address petitioner's argument as we have phrased it, the court necessarily rejected it. The court found that Manning had conducted a reasonable investigation into the circumstances surrounding petitioner's confession and had performed competently in presenting his motion to suppress. Among other things, Manning obtained transcripts of the recorded statements petitioner had given the police; requested and obtained a commitment hearing at which he examined Williams about his interrogation of petitioner; effectively cross-examined Krauss and Williams at the January 21, 1987 hearing about their interrogation of petitioner and the state of his intoxication on the morning of May 31, 1986; elicited Williams's admission that, when questioned on May 31, petitioner could not remember attacking Beatty; elicited Krauss's admission that petitioner was distraught and crying when he was told on June 1 that Beatty had died and that he and Beggs were being charged with murder; and attempted (without success) to have Krauss and Williams admit that,

---

[43] He continued to tell Williams that he had no recollection of assaulting Beatty, thereby inferring that he could not have been involved.

during the conversations with petitioner they did not record, they told him that Beggs would get the death penalty if he did not confess.

At the end of the day, the state habeas court concluded that petitioner had failed to satisfy the first prong of Strickland's test and therefore denied his claim. Having reached that conclusion, the court opted not to take the next step and consider whether petitioner also had failed to satisfy Strickland's second prong, prejudice. After examining the transcripts of the pretrial suppression hearing and the evidentiary hearing in the state habeas court, the district court agreed four square with that court's holding as to Strickland's first prong.

Petitioner argues that the state habeas court's decision is contrary to or involved an unreasonable application of Strickland. The essence of his argument is that the habeas court should have found that, given the professional norms prevailing in Georgia at the time, a reasonably competent attorney, standing in Manning's shoes, would have called Williams's threats about Beggs to the trial court's attention and probably obtained a ruling that petitioner's confession was involuntary.

The reasonably competent attorney standard is an objective, not a subjective, standard. See Chandler, 218 F.3d at 1315. Therefore, in assessing whether the state habeas court's decision is contrary to or involved an

unreasonable application of Strickland's first prong, we consider what a reasonably competent attorney would likely have done under the circumstances facing Manning.

As an initial matter, a reasonably competent attorney, armed with the gist of what had transpired during petitioner's five encounters with the police at the Detention Center, would have considered moving the court, which Manning in fact did, to suppress petitioner's confessions to Krauss and Putnam and then to Williams. A reasonably competent attorney would have recognized two possible bases for attacking these statements as involuntary. The first, that petitioner was intoxicated when he confessed, was problematical, at best: Manning explored that theory in full. He established that when Williams questioned petitioner in the early morning hours of May 31, he appeared to have been drinking. The evidence is, though, as petitioner tacitly concedes, that by the time he confessed to the murder, at 10:00 a.m. on June 1, he had been cold sober for more than a day. He was also cold sober when he repeated his confession at 1:05 that afternoon and again at 11:10 the next morning. In short, there was nothing to support the notion that petitioner's confession was involuntary due to intoxication.

The second basis for challenging the confession – the basis petitioner presented to the state habeas court – was that the confession was the product of

police coercion, the threat that Beggs would be charged as an accessory to murder. The threat, delivered by Detective Williams, set the stage for, and tainted, petitioner's confession to Krauss and Putnam at 10:00 a.m. the following day.[44] To pursue this theory, a reasonably competent attorney would look to Georgia law and the federal cases for the principle that an accused's confession is inadmissible if it is obtained by threatening the accused that his spouse, or loved one, would be prosecuted if he did not confess to the crime.[45] If the law so held, the reasonably competent attorney would then have considered whether to have petitioner take the witness stand (at the hearing on his motion to suppress) to explain why he confessed.[46]

In researching the admissibility of confessions under Georgia law, counsel would find that O.C.G.A. § 24-3-50 spoke directly to the issue.[47] That section

_____

[44] Petitioner has not contended that Krauss's statement to him that Beggs was being charged with murder somehow constituted unlawful police misconduct that rendered his confession involuntary. Krauss told petitioner this after petitioner asked him what was going to happen to Beggs.

[45] For purposes of this discussion, we consider petitioner and Beggs to have been husband and wife.

[46] We note that, in prosecuting his ineffective assistance claim, petitioner has never represented that he would have testified at the pretrial suppression hearing that Williams's threat that Beggs would be charged as an accessory to murder caused him to confess.

[47] We assume that the Georgia court's interpretation of this code provision would be as limiting as the federal constitutional rule, if not more so.

54

stated: "To make a confession admissible, it must have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury."[48]  Petitioner points to no Georgia case holding inadmissible a confession obtained under circumstances similar to those confronting Manning.  In fact, the Georgia Supreme Court has yet to decide the question of whether a threat to arrest or prosecute the accused's spouse, or loved one, renders the accused's confession inadmissible under section 24-3-50.  The court, however, has defined "injury" as "physical or mental torture" and "benefit" as "the hope  of a lighter sentence" for the individual being interrogated.  Cooper v. State, 347 S.E.2d 553, 557 (Ga. 1986) (defining "benefit")[49]; State v. Roberts, 543 S.E.2d 725, 729 (Ga. 2001) (citing Coker v. State, 33 S.E.2d 171, 174 (Ga. 1945) for the proposition that "[i]nsofar as the 'remotest fear of injury' is concerned, any confession obtained through physical or mental torture is inadmissible.").  Drawing on these definitions, the Georgia Court of Appeals has uniformly held that a police officer's threat to an accused to charge or arrest a family member if the accused does not confess does not constitute a "fear of injury" or "hope of benefit" under section 24-3-50.  See Jackson v. State, 634 S.E.2d 846, 850 (Ga. Ct. App. 2006) (officer's

_____

[48]  Section 24-3-50, as it appeared in 1987, is still in effect.

[49]  Cooper v. State was decided on September 3, 1986, over four months prior to the hearing on the motion to suppress petitioner's confession.

promise not to charge the accused's family members if the accused confesses did not constitute "promise of a benefit" under § 24-3-50 because the benefit must relate to charge or sentence facing the accused); Griffin v. State, 570 S.E.2d 611, 613 (Ga. Ct. App. 2002) (officer's statement that the accused's girlfriend might get in trouble if he did not confess did not constitute "fear of injury" under § 24-3-50 because injury refers to physical or mental torture of the accused); Riviera v. State, 380 S.E.2d 353, 355 (Ga. Ct. App. 1989) ("Any benefit to be derived by the hope that defendant's wife would not be taken to jail was purely collateral . . . It did not contemplate the hope of lighter punishment."); Copeland v. State, 291 S.E.2d 560, 562 (Ga. Ct. App. 1982) (officer's statement to the accused that his wife could be charged with theft was "a truism, a recounting of the facts, and did not constitute a fear of injury. . .") (internal quotation marks omitted).

Putting the post-1986 decisions aside, the precedent available to a lawyer standing in Manning's shoes in litigating the motion to suppress consisted of Cooper v. State and its predecessor, Coker v. State. Neither would have provided counsel much comfort. Nonetheless, in that neither the Georgia Supreme Court nor the Georgia Court of Appeals had decided a case precisely on all fours with the case at hand, Manning would not have been foreclosed from advancing as a matter of Georgia law the argument petitioner contends he should have presented.

What would a reasonably competent attorney have found in the federal cases? He would have discovered the well-established principle that the Due Process Clause of the Fourteenth Amendment requires that, to be admissible, an accused's confession must be voluntary, in that the accused "made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him." Jurek v. Estelle, 623 F.2d 929, 937 (5th Cir. 1980) (en banc), cert. denied, 450 U.S. 1014, 101 S. Ct. 1724, 68 L. Ed. 2d 214 (1981) (synthesizing Supreme Court "expressions . . . of the fundamental requirements for voluntariness.").[50] Petitioner claims, in essence, that his will was overborne by Williams's threat that, unless he confessed, Beggs would be charged.

When Williams told petitioner what was going to happen to Beggs if he refused to confess, the police had probable cause to charge Beggs with aggravated assault.[51] A reasonably competent attorney looking for federal cases in point

---

[50] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

[51] Petitioner has never contended that the police lacked probable cause to arrest Beggs, at noon on May 31, for aggravated assault, or to charge her with murder the next day, after Beatty expired. The fact that the police had probable cause in both instances clearly distinguishes this case from Lynumn v. Illinois, 372 U.S. 528, 83 S. Ct. 917, 9 L.Ed.2d 922 (1963), and United States v. Tingle, 658 F.2d 1332 (9th Cir. 1981), the cases on which petitioner relies. In Lynumn, the police told Lynumn that if she did not confess to selling narcotics, the state financial aid for her infant children would be cut off and they would be placed in state custody. The Court held

57

would have found precedent holding that the threat to charge a person for whom the police have probable cause to arrest does not, in and of itself, render the accused's guilty plea invalid.  See United States v. Nuckols, 606 F.2d 566, 568–70 (5th Cir. 1979); see also Martin v. Kemp, 760 F.2d 1244, 1247–48 (11th Cir. 1985) (affirming the "governing legal principle" that where a defendant claims that his guilty plea is involuntary because prompted by police threats to prosecute a third party, the defendant bears the "heavy burden" of showing that at the time the threats were made, the police did not have probable cause to believe that the third party had committed a crime.").  Indeed, the Fifth Circuit had applied that principle in passing on the voluntariness of a confession several months before the hearing on petitioner's motion to suppress in Allen v. McCotter, 804 F.2d 1362 (5th Cir. 1986).  In that case, a police officer told the accused that his wife would not be charged if he confessed.  Id. at 1364.  The accused confessed, but subsequently challenged the confession as involuntary due to police coercion.  Id. The court rejected his challenge because the officer had probable cause to arrest the accused's wife at the time he made the alleged threat.  Id.  Decisions handed

her confession involuntary.  372 U.S. at 533–34, 83 S. Ct. at 920.  In Tingle, an FBI agent told Tingle that she would not see her young child for "a while" if she went to prison.  658 F.2d at 1336.  Tingle confessed.  Id.  The Ninth Circuit held the confession involuntary because it had been coerced by the agent's implicit threat to separate Tingle from her child.  Id.  Both cases are inapposite.  In Lynumn and Tingle, the officers' threats involved third-parties, the defendant's children no less, who obviously had not been involved in any criminal wrongdoing.

58

down subsequent to petitioner's prosecution reiterate the principle <u>Allen v. McCotter</u> announced. See, <u>e.g.</u>, <u>Thompson v. Haley</u>, 255 F.3d 1292, 1297 (11th Cir. 2001) (holding there was no police coercion when police officer told the accused that his girlfriend would be charged for murder unless he confessed, because the officer had probable cause to arrest the girlfriend for murder); <u>see also</u> <u>United States v. Johnson</u>, 351 F.3d 254, 257, 260–61, 263 (6th Cir. 2003) (holding there was no police coercion when police threatened to arrest the accused's sister if the accused did not confess, because police had valid probable cause to arrest the sister). In sum, at the time Manning was litigating the motion to suppress, federal case law did not counsel the suppression of petitioner's confession as involuntary.

We will assume, though, for the sake of argument, that Manning should have introduced the two Williams statements at issue and urged the court to find that they coerced petitioner's confession. Would the court have seized upon the statements and suppressed the confession? Not a chance – and a reasonable attorney, in Manning's position, would have realized this. For the remainder of the interrogation during which Williams made the statements, petitioner continued to adhere to his no-memory claim. Well over twenty-four hours passed uninterrupted before petitioner was interrogated by Krauss and Putnam. It was as petitioner was being escorted back to his cell that he asked Krauss about Beggs's

59

status and elicited the fact that Beggs had been charged with murder.[52]  Only then did petitioner confess.  It was obvious that the confession was caused, i.e. motivated, not by police overreaching in the form of Williams's day-old statements, but by Krauss's response to petitioner's own inquiry.  Cf. Jacobs v. Singletary, 952 F.2d 1282, 1295–96 (11th Cir. 1992) (discussing, in the context of determining the voluntariness of waiver of the right to remain silent, the passage of "a significant, uninterrupted period of time" and the defendant's own initiation of the dialogue with police).  That was the trigger; petitioner would no longer stand on what he had been telling Williams – that he had no recollection of assaulting Beatty and was, in effect, innocent.  Since petitioner has never explained why he confessed, a reasonable explanation is that he did so to save Beggs from prosecution.  Regardless of his motive, absent some showing of police coercion, petitioner's confession was not constitutionally impermissible.  Colo. v. Connelly, 479 U.S. 157, 164; 107 S. Ct. 515, 520; 93 L. Ed. 2d 473 (1986) ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.")

---

[52] What Williams had suggested would happen, if petitioner did not confess and take full responsibility for the crime, had in fact happened.

A reasonably competent attorney, standing in Manning's shoes, would have likely gone through the above analysis and concluded, as we do, that Williams's statements to petitioner in the May 31, 3:50 a.m. interrogation would not have provided the basis for a successful challenge to petitioner's confession. Thus, we hold that the state court did not unreasonably apply Strickland in concluding that Manning performed effectively in challenging petitioner's confession.

B.

John Davis handled petitioner's appeal to the Georgia Supreme Court. In his brief, he did not assign as error the trial court's denial of the motion to suppress petitioner's confession. Petitioner claims that Davis's failure to do so deprived him of the effective assistance of appellate counsel.

The state habeas court denied petitioner's claim as having failed both the performance and prejudice prongs of the Strickland standard. The court did so in conclusory terms, without explaining why, under the prevailing professional norms, a reasonably competent attorney would not have appealed the trial court's decision to admit the confession into evidence, or why the failure to appeal the decision caused petitioner no prejudice. The district court, in upholding the habeas court's rejection of petitioner's claim, indicated that it was troubled by Davis's failure to contest the admissibility of petitioner's confession on appeal,

61

but, like the habeas court, concluded that petitioner had not shown Strickland prejudice.

We affirm the district court's decision for a different reason: Davis lacked a plausible reason for challenging in the Georgia Supreme Court the trial court's denial of petitioner's motion to suppress. He was not ineffective under Strickland in not appealing the trial court's ruling. A reasonably competent attorney standing in his shoes would not have appealed. Why? Because the record of the January 21, 1987 suppression hearing, the record on which an appeal would have to be based, contained nothing to support an argument that the trial court should have found petitioner's confession involuntary.

In examining whether Manning's performance at the January 21 hearing was deficient, we posited the strategy a reasonably competent attorney would have pursued in challenging petitioner's confession. Counsel would have explored the possibility, however remote, that the confession was involuntary because petitioner was intoxicated when he confessed to Detectives Krauss and Putnam. This, in turn, tainted, and thus made inadmissible, his subsequent confession to Williams. The possibility that petitioner's confession was tainted by intoxication, however, fell by the wayside for lack of evidence. The other possibility, that the confession was the product of police coercion, collapsed as well; for the coercion

– if that is how we are to view Krauss's statement that Beggs had been charged with murder – was invited by petitioner's question as to Beggs's status.  In sum, an appellate argument that petitioner's confession was involuntary because it was given while petitioner was intoxicated or coerced by Krauss's statement that Beggs had been charged with murder would have appeared frivolous.

In prosecuting this claim in the state habeas court, petitioner pointed to nothing in the record of the January 21 hearing on the motion to suppress that might support the argument that his confession was involuntary.[53]  Instead, he pointed to the two Williams statements cited supra, and argued that the trial court erred in failing to consider them as persuasive evidence that his confession was coerced.  The problem petitioner encounters in relying on Williams's statements is that they were not before the trial court.  Manning failed to make them part of the record.  Had Davis appealed the trial court's denial of the motion to suppress, the Georgia Supreme Court would not have considered the Williams statements because they were not part of the record before the trial judge.  It requires no citation of authority to say that it is a time-honored rule of appellate jurisprudence that appellate courts do not reverse trial court findings of fact based on evidence

---

[53] By the same token, in prosecuting his habeas petition in the district court, petitioner cited nothing in the record of the suppression hearing to support his argument that the trial court erred in denying his motion to suppress.

not presented to the trial court in the first instance.  Thus, petitioner's claim that Davis was ineffective for not challenging the trial court's suppression ruling based on the Williams statements is meritless.

V.

In his state habeas petition, petitioner claimed that Donald Manning disregarded his duty to search for and present mitigating evidence that would likely have persuaded the jury to forego the death penalty.  According to petitioner, significant mitigating evidence was available, but Manning simply neglected to pursue it.  As a result, Manning deprived him of a fair trial, a trial whose result is reliable.

Petitioner proffered the evidence Manning could have found to the state habeas court in the form of affidavits.  These affidavits came from two sources.  The first consisted of family members and people who had lived near petitioner in Limecrest, Ohio, during his early years – before he left home for California at age seventeen.[54]  As a whole, their affidavits described the Newland family's poor living conditions, the repeated abuse petitioner and his siblings suffered at the

---

[54] Petitioner presented the court with eleven affidavits from family members and residents of the Limecrest, Ohio neighborhood in which he was raised.  Petitioner refers to these affidavits as portraying part of his "life history."

hands of an alcoholic mother,[55] and petitioner's consumption of drugs and alcohol

at an early age.[56] These affiants stated that they would have testified on

petitioner's behalf had they been called, but no one contacted them.

The second source of affidavits consisted of a psychologist, Dr. Barry

Crown, and a neurologist, Dr. Thomas Hyde. Dr. Crown's affidavit, discussed in

more detail, subpart C, infra, concludes that petitioner suffered from permanent

organic brain damage which "[predisposed] him to markedly increased impulsivity

and impaired judgment." Dr. Crown further diagnoses petitioner as having a

mood disorder, termed Alcohol Induced Rage Disorder, that developed as a result

of his childhood abuse and brain injury. As a result of this disorder, acute alcohol

intoxication triggered feelings of intense, uncontrollable rage in petitioner and

---

[55] Petitioner was said to have been exposed to sexual abuse from an uncle as well as physical abuse from his mother. In early adolescence, petitioner, to get away from his mother, sometimes would stay at his maternal grandparents' house, where the uncle sodomized him.

[56] Statements by Clarence Newland, one of petitioner's brothers, typify the information provided by the proffered affidavits: "The house was very small . . . during the winter months, the house was freezing. Our family had no plumbing, no running water . . . . Our mother was a terror . . . . Beatings were so frequent that it was a routine part of our lives. She would hit Bobby, me, and the other kids with anything she could get her hands on. She would lash Bobby all over his body . . . . She would slam his head into the walls."

The affidavits also commented on petitioner's frequent use of alcohol as a teenager and young adult. For example, the affidavit of Frederick Newland, another of petitioner's brothers, states: "There was a lot of drinking and drug use in our neighborhood, and Bobby got caught up in that. He has been drinking and using drugs since he was just of kid of around ten or twelve. It has always been a part of his life . . . . All of us Newland brothers drank a lot and partied pretty hard, but Bobby really had problems. He was an addict."

65

"[tended] to render him physiologically unable to exercise behavioral control." Dr. Crown explained that, given the combination of petitioner's mood disorder and brain injury, petitioner's acute intoxication on the night of the murder "exacerbated and amplified the disinhibiting effects of the brain damage, triggering an episode of uncontrollable rage and aggressivity, during which the murder occurred."

Dr. Hyde's affidavit, also discussed in greater detail infra, provides a specific neurological diagnosis, stating that petitioner suffers from "bilateral frontal lobe dysfunction," which results in "impaired executive functions, decreased disinhibition, and tendency toward impulsivity," and that this condition was amplified by excessive alcohol intake. Dr. Hyde concurred with Dr. Crown's diagnosis of Alcohol Induced Rage Disorder and with Dr. Crown's conclusion that petitioner suffered from an episode of uncontrollable rage at the time of the murder.

Petitioner contends that Manning could have obtained the expert opinion testimony of Drs. Crown and Hyde – or experts who would have rendered the same opinions they did – had he applied to the trial judge for funds for independent psychological and neurological examinations. But Manning failed to apply.

66

Manning testified at the evidentiary hearing the state habeas court held on March 3, 1998. The State called Manning to the stand to rebut petitioner's claims that his performance was constitutionally inadequate. Petitioner did not testify, either in person or by affidavit; consequently, the court had to resolve petitioner's ineffective assistance claims on the basis of Manning's testimony and the record of the proceedings in the trial court, both pretrial and trial. We relate first, in subpart A below, what Manning had to say in response to the allegation that he made little effort to search for evidence about petitioner's early years – his upbringing in Limecrest, Ohio, his life before he left for California at age seventeen. Next, we present the argument habeas counsel made to the state habeas court in an effort to convince the court that Manning's performance was deficient. Finally, we consider whether the court's decision that Manning's performance satisfied the first prong of Strickland's standard is unassailable under 28 U.S.C. § 2254(d)(1), as the district court held.

We relate in subpart B what the record reveals about Manning's performance in not pursuing funds for independent psychological and neurological evaluations, such as those Drs. Crown and Hyde rendered. Then, as in subpart A, we turn to the habeas court's decision that his performance satisfied Strickland's first prong and conclude, as the district court did, that petitioner failed to make out

67

a case for relief under section 2254(d)(1).

Finally, in subpart C, we assume for the sake of argument that Manning's failure to investigate petitioner's childhood and develop a life history and his failure to seek funds for an independent psychiatric and neurological evaluation amounted to ineffective assistance of counsel and proceed to the question the habeas court summarily disposed of: whether the ineffectiveness prejudiced petitioner's case in the penalty phase of the trial.[57]

A.

1.

In his testimony before the habeas court, Manning acknowledged that his investigation into petitioner's life history in Limecrest, Ohio, was limited and then explained why it was so. First, petitioner specifically instructed him not to contact his family or to send an investigator to Limecrest, Ohio, where he was born. More generally, petitioner emphatically discouraged him from researching his past.[58]

---

[57] To reach the prejudice issue, the state habeas court, having found that Manning's performance satisfied <u>Strickland</u>, necessarily assumed that petitioner prevailed on <u>Strickland</u>'s performance prong.

[58] At the evidentiary hearing, Manning testified as follows in an exchange with Assistant Attorney General Susan Boleyn, who represented the State:

MANNING: [The information Mr. Newland initially provided me was] very brief, and I felt at the time uninformative responses. And I expressed that to Mr. Newland at the time, and I said, you know, I need to know where you're from. And . . . I asked this

68

Second, after repeatedly asking petitioner about his past and receiving very little information in return, he was unsure of the significance of petitioner's background and doubted whether petitioner was being honest about the information he did provide. Third, petitioner did not give him the information he needed to contact family members or anyone else who might be able to testify about petitioner's upbringing, his childhood and adolescence.

## 2.

In urging the court to find Manning's performance inadequate, habeas counsel took issue with Manning's second and third explanations. Relying on other statements Manning made at the evidentiary hearing, he argued that

question many times, and he would consistently say, look, this is my problem, I'm in this. I said well, what about your family, do you have brothers, sisters, what your – anybody that I can contact just to provide you with some money for the commissary at least. No, sir, I don't want anybody involved in this, this is my problem, don't you do that, don't contact anybody. And I didn't have anybody to contact. On several occasions I would ask Mr. Newland for more information and the closer we got to trial, the more insistent I became because I knew that we were facing a jury and it could be a capital jury that would have to decide his fate and I wanted to be able to humanize him to that jury and we had – the fact situation in this case was not – not pretty, let's say, and I needed something from him, some people to put up there to testify about the good things in his life, what he had done. But he just kept saying, look, I was a hippy [sic] , I moved from place to place, I don't have any friends, and leave that out of it, this is my problem. That was his attitude and it was very frustrating for me.
BOLEYN: What, if any, consideration did you give to sending [the public defender's investigator] to Ohio based on Mr. Newland's response to your questions?
MANNING: Well, I didn't give any consideration to it because he didn't want that to happen and we didn't – you know, I try to do what my client wants to the extent that I can and he was adamant about this, he didn't want any of his relatives involved – quote, involved in this.

69

Manning knew he needed to research petitioner's background to prepare for the penalty phase of the trial, but failed to investigate solely because he believed he had insufficient information to begin an investigation.[59]  Counsel then claimed that Manning actually had sufficient information to undertake a background investigation, since petitioner had informed him that he was born in Limecrest, Ohio, and had attended Shawnee High School.  Counsel offered several examples of how Manning could have followed up on the limited information petitioner provided.  He argued that Manning could have requested high school records and interviewed one or more of his teachers, contacted the public defender's officer in Clark County, Ohio, for assistance, or sent his office's investigator to Limecrest.  Had Manning taken any of these steps, counsel argued, he could have learned the whereabouts of the Newland family members and uncovered the evidence of petitioner's unfortunate childhood as proffered to the state habeas court.[60]

---

[59] For example, Manning had stated at the evidentiary hearing: "if I had been able to do that, to contact people that would have had this [background information], I would have done that and then say [sic], Mr. Newland, this is what I found out, now I believe its helpful, or its not helpful and go from there."

[60] To show that Manning could have taken these steps, counsel referred the court to the affidavits of William Merrell, the director of the Public Defender's Office of Clarke County, Ohio (the county in which Limecrest is located) and Frances Kimble, one of petitioner's elementary school teachers.  They testified that if they had been contacted by petitioner's attorney, they would have provided assistance in locating petitioner's family members or others with knowledge of his upbringing.

3.

After considering Manning's testimony, the affidavit testimony proffered with petitioner's habeas petition, and argument of counsel, the court issued its findings of fact. It found that: (1) petitioner instructed Manning not to investigate his background; (2) Manning explained the role and importance of petitioner's personal history as mitigation evidence and unsuccessfully attempted to get such evidence from him on several occasions; (3) Manning attempted to learn of petitioner's background from Beggs and unspecified "other people that knew [petitioner]," but was unsuccessful; (4) Manning did not send an investigator to Limecrest, Ohio, because "[petitioner] did not want that to happen . . . he was adamant about this, he didn't want any of his relatives involved"; and (5) Manning was ethically bound to follow his client's instructions.[61] In addition, the court

---

[61] Petitioner argues that the "central rationale for the state habeas court's . . . denial of Mr. Newland's ineffectiveness claim . . . is the notion that trial counsel was ethically bound to follow Mr. Newland's alleged instruction not to involve his family in this case." We disagree, reading the state court's decision to be more broadly based, as state court says in the paragraph with which it begins its analysis: "Reviewing the totality of the circumstances from the perspective of counsel at the time of trial and in light of Petitioner's inability and unwillingness to provide background information for use as mitigating evidence, this Court finds that Petitioner has not established attorney error and prejudice based on an alleged failure to investigate Petitioner's background."

Even if, arguendo, the state's court decision rested largely on the grounds that counsel was ethically bound to follow petitioner's instruction, our review under 28 U.S.C. § 2245(d)(1) is only of the state court's decision, not of the reasoning it used to arrive at its conclusions. See

71

concluded that Manning's decision to emphasize Newland's religious conversion in the penalty phase of the trial was a "legitimate, strategic decision . . . hampered as trial counsel was by the lack of assistance he received from Petitioner."

The magistrate judge, in his report and recommendation, adopted by the district court, also emphasized that petitioner had instructed Manning not to investigate his background. The judge reasoned that "the state habeas court's conclusions that trial counsel's actions were reasonable, in light of the restrictions Newland placed upon them, is not contrary to, or an unreasonable application of, the Supreme Court's holding in Strickland."

As indicated in part II.E, supra, petitioner moved the district court to alter or amend its judgment, contending that in light of the Supreme Court's decisions in Rompilla v. Beard, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005); Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003); and Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000), let alone the Court's decision in Strickland, the district court should have held that the state habeas decision is contrary to, or an unreasonable application of, clearly

---

Wright v. Sec'y for the Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002) (holding that we are required to give deference under section 2245(d)(1) to a state court's decision, regardless of whether the court provides any rationale for the decision: "[a]ccordingly, all that is required is a rejection of the claim on the merits, not an explanation").

established federal law under 28 U.S.C. § 2254(d)(1). The district court disagreed and therefore denied petitioner's motion.

4.

Petitioner argues that the district court erred: the state habeas court's decision is contrary to, or an unreasonable application of, Strickland, and, more importantly for the purposes of the discussion below, Williams, Wiggins, and Rompilla. These three decisions came down after the date petitioner's convictions became final (at the conclusion of the direct appeal process); Wiggins and Rompilla were decided after the Georgia Supreme Court denied petitioner's application for a certificate of probable cause to appeal the denial of his petition for habeas corpus relief. Given the dates of these decisions, the question arises as to whether we may consider them in light of the restrictions imposed on our review by Teague v. Lane, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334, (1989), and AEDPA. See Horn v. Banks, 536 U.S. 266, 272, 122 S. Ct. 2147, 2151, 153 L. Ed. 2d 301 (2002) ("Thus, in addition to performing any analysis required by AEDPA, a federal court considering a habeas petition must conduct a threshold Teague analysis when the issue is properly raised by the state."). Although the State has not suggested that the threshold analysis is required here,

we raise Teague at our discretion. Caspari v. Bohlen, 510 U.S. 383, 389, 114 S. Ct 948, 953, 127 L. Ed. 2d 236 (1994).

Before proceeding further, we must acknowledge that this court has utilized Williams, Wiggins, and Rompilla in its evaluation of a state court denial of habeas relief, notwithstanding that the three decisions were handed down subsequent to the state court ruling. See, e.g., Stewart v. Sec'y, 476 F.3d 1193, 1214 n.29 (11th Cir. 2007) (distinguishing Rompilla, although state habeas proceeding concluded before Rompilla was decided); Callahan v. Campbell, 427 F.3d 897, 926, 934–35 (11th Cir. 2005) (discussing Williams and Wiggins, although Callahan's state habeas proceeding concluded before these cases were decided); Crawford v. Head, 311 F.3d 1288, 1314–16 (11th Cir. 2002) (discussing Williams, although it was decided following the conclusion of Crawford's state habeas proceeding). We have not, however, addressed in any great detail the Teague or AEDPA issues that may be raised by our reliance on one or more of these decisions in reviewing a state habeas court's decision handed down earlier. In the analysis we embark on now, we do not deviate from the results we have reached before; we merely explicate the analytical steps which led to such results.

Our analysis proceeds as follows. First, we apply Teague. Second, we determine if Williams, Wiggins, and Rompilla are "clearly established Federal

law" under 18 U.S.C. § 2254(d)(1). This, in turn, requires that we address two subsidiary questions: how has the Court instructed us to define "clearly established Federal law," and, if a case constitutes "old law" under Teague, how does that affect, if at all, our analysis of whether it is "clearly established Federal law" for AEDPA purposes?

Under Teague v. Lane, a state prisoner seeking collateral relief may not rely on a new constitutional rule of criminal procedure that was announced after the date his conviction became final. 489 U.S. at 310, 109 S. Ct. at 1075. A state conviction becomes final "when the availability of direct appeal to the state courts has been exhausted and . . . a timely filed petition [for a writ of certiorari] has been finally denied." Caspari, 510 U.S. at 390, 114 S. Ct. at 953. A case announces a new rule "when it breaks new ground or imposes a new obligation on the States or Federal Government," but not if the result in that case is "dictated by precedent existing at the time the defendant's conviction became final." Teague, 489 U.S. at 301, 109 S. Ct. at 1070. Petitioner's conviction became final on November 28, 1998, when the Supreme Court denied certiorari review. Strickland, decided in 1984, established the law governing ineffective assistance of counsel claims and is the relevant precedent for our Teague analysis.

Williams, Wiggins, and Rompilla are not new law under Teague. Justice

75

Kennedy wrote in his concurrence in Wright v. West that when "the beginning point is a rule of this general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent." 505 U.S. 277, 308–309, 112 S. Ct. 2482, 2499, 120 L. Ed. 2d 225 (1992). We have echoed Justice Kennedy's reasoning. See Hart v. Attorney Gen., 323 F.3d 884, 893 n.16 (11th Cir. 2003) ("We believe that in areas of the law . . . in which general principles announced by the Supreme Court will out of necessity be applied to varying factual situations on a case by case basis, it is acceptable to derive clearly established federal law from these general principles."). Strickland set forth the paradigmatic example of a rule of general application; it establishes a broad and flexible standard for the review of an attorney's performance in a variety of factual circumstances. In Williams, Wiggins, and Rompilla, the Court did nothing more than apply Strickland's standard to a specific set of circumstances: in Williams, counsel's failure to uncover available state records indicating Williams's "nightmarish childhood," 529 U.S. at 395, 120 S. Ct. at 1514; in Wiggins, counsel's failure to investigate Wiggins's background, despite evidence of his abusive upbringing, 539 U.S. at 524, 123 S. Ct. at 2536–2537; and in Rompilla, counsel's failure to investigate a file containing evidence that the

76

state intended to use in aggravation. 545 U.S. at 383, 125 at 2463.

In concluding that these cases are not new law, we are following the Court's own characterization of its decisions and the characterization of these decisions by our sister circuits. In Williams, the Court acknowledged that "the merits of [Williams's] claim are squarely governed by our holding in Strickland v. Washington." 529 U.S. at 390, 120 S.Ct at 1511; see also Allen v. Massie, 236 F.3d 1243, 1245 (10th Cir. 2001) ("There is simply nothing in the Supreme Court's decision in Williams that even remotely resembles a new rule of constitutional law. Instead, the William's Court merely reaffirmed that all claims of ineffective assistance of counsel should be resolved by reference to the well-established rubric set forth in Strickland."). In Wiggins, the Court, in discussing the Williams decision, stated: "In highlighting counsel's duty to investigate [in Williams] . . . we applied the same 'clearly established' precedent of Strickland that we apply today." 539 U.S. at 522, 123 S. Ct. at 2536 (emphasis added); see also Smith v. Dretke, 422 F.3d 269, 279 n.2 (5th Cir. 2005) ("Wiggins was announced after the district court's ruling but it should not be considered a 'new rule' such that Teague v. Lane might bar habeas relief."). We apply the Court's characterization of Williams and Wiggins to Rompilla, which, like Williams and Wiggins, was only an application of the principles elucidated in

Strickland to a novel set of facts. Rompilla, 545 U.S. at 385–388, 124 S. Ct. at

2464–68. Indeed, we have held that Rompilla was not a new rule of law under

Teague. See In re Hutcherson, 468 F.3d 747, 749 (11th Cir. 2005) ("The Court's

decision in Rompilla was another interpretation of the Court's long-standing

principles set forth in Strickland . . . It did not set forth a 'new rule of law.'").

Because these cases are not new law under Teague, we move to the question

of whether, under 28 U.S.C. § 2254(d)(1), we may consider these decisions as

"clearly established Federal law." Section 2254(d)(1), in relevant part, reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States

The Williams Court instructed that "clearly established Federal law" is the:

> "holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state court decision." In this respect, the "clearly established Federal law" phrase bears only a slight connection to our Teague jurisprudence. With one caveat, whatever would qualify as an old rule under our Teague jurisprudence will constitute "clearly established Federal law, as determined by the Supreme Court of the United States" under § 2254(d)(1). . . . The one caveat, as the statutory language makes clear, is that § 2254(d)(1) restricts the source of clearly established law to this Court's jurisprudence.

529 U.S. at 412; 120 S. Ct. at 1523 (emphasis added) (citation omitted).[62]

The Court's definition of "clearly established Federal law," raises two questions. First, when is the relevant state court decision handed down; and, second, if, as in this case, the Supreme Court decisions are "old law" under Teague, but were decided subsequent to the relevant state court decision, may we

---

[62] Justice Stevens, though, writing for three other Justices, in a concurrence to Williams, conflated the meaning of "clearly established Federal law" under AEDPA with the standards used under the Teague analysis, stating: "It is perfectly clear that AEDPA codifies Teague to the extent that Teague requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state court conviction became final." 529 U.S. at 380, 120 S. Ct. at 1506. Justice Stevens used this formulation again in part III of Williams, where he was writing for the majority, stating: "The threshold question under AEDPA is whether Williams seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." Id. at 389, 120 S. Ct. at 1511.

We have followed both definitions of "established Federal law." In Schwab v. Crosby, we did not use the phrase "relevant state court decision," but rather stated that we identified the law as being clearly established at the time when the petitioner's state court conviction became final on direct appeal. 451 F.3d 1308, 1324 (11th Cir. 2006) ("The result is that a state court decision based on a conclusion of law is to be accepted by a federal habeas court unless a Supreme Court decision in existence at the time the conviction became final truly dictated a different conclusion of law."). In other decisions, however, we have relied on the "relevant state court" formulation. See, e.g., Crawford v. Head, 311 F.3d 1288, 1315 n.2 (11th Cir. 2001) (referring to law at the time of the relevant state court decision); Putnam v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001) (same). We are not the only court to have struggled to reconcile this apparently contradictory language in Williams. See Brown v. Greiner, 409 F.3d 523, 534 n.3 (2d Cir. 2005) (recognizing the conflict between Justice Stevens's and Justice O'Connor's formulations and stating: "the Supreme Court has provided inconsistent guidance on the precise time to which a federal court should look to assess what was 'clearly established Federal law, as determined by the Supreme Court'").

We follow Justice O'Connor's "relevant state court" definition largely because the Court has clearly favored this definition in cases after Williams, using it in at least four other decisions: Carey v. Musladin, _ U.S._, 127 S. Ct. 649, 653, 166 L. Ed. 2d 482 (2006); Yarborough v. Alvarado, 541 U.S. 652, 661, 124 S. Ct. 2140, 2147, 158, L. Ed. 2d 938 (2004); Lockyer v. Andrade, 538 U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003); Tyler v. Cain, 533 U.S. 656, 664, 121 S. Ct. 2478, 150 L. Ed. 2d 632 (2001). Justice Stevens's definition has not been used again by the Court.

still consider these decisions?

To reach a definition of the relevant state court decision, we consider Williams in conjunction with the language of § 2254(d)(1). The most reasonable interpretation of § 2254(d) is that the state court's "adjudication on the merits," which triggers our review under the statute, is the same "adjudication of the claim" that we review for its application of federal law. This adjudication of the claim is also the relevant state court decision referenced in Williams. Therefore, the highest state court decision reaching the merits of a habeas petitioner's claim is the relevant state court decision.

We note that the relevant state court decision may come before or after finality for Teague purposes. For example, with respect to an ineffective assistance of counsel claim, the state supreme court, on collateral attack, will likely be the highest state court to apply federal law to adjudicate the merits of the claim. In another situation, an intermediate state appellate court may make the relevant state court decision, assuming that the state supreme court exercises its discretion to deny certiorari review, and such denial does not constitute a decision on the merits. This definition of the relevant state court decision is consistent with the Supreme Court's precedent and our own decisions – which have identified the relevant state court decision as occurring at different stages in the appellate

process, depending on when the claim at issue was decided. In Carey v. Musladin, the Court defined the relevant state court decision as the mid-level California appellate court decision which rejected petitioner's claim on the merits on direct appeal. ___ U.S. ____, 127 S. Ct. 649, 653, 166 L. Ed. 2d 482 (2006). By contrast, in Wiggins, the majority and the dissent debated whether it was appropriate to apply Williams to Wiggins's claim, since Williams was decided after the "decision at issue," which both the majority and dissent identified as the Maryland Court of Appeals's rejection of Wiggins's claim on collateral attack. 538 U.S. at 522, 542, 123 S. Ct. at 2535–36, 2546. Similarly, in Crawford v. Head and Putnam v. Head, we identified the relevant state court decision as the final denial of habeas relief, while in Gore v. Secretary for the Department of Corrections, we identified the decision as the Florida Supreme Court's disposition of petitioner's claim on direct appeal. Gore, 492 F.3d 1272, 1292, 1294 (11th Cir. 2007); Crawford, 311 F.3d 1288, 1315 n.2 (11th Cir. 2002); Putnam, 268 F.3d 1223, 1241 (11th Cir 2001); see also Frazier v. South Carolina, 430 F.3d 696, 706 n.7 (4th Cir. 2005) (relevant state court decision is the state habeas court's rejection of petitioner's claim on the merits).

As we did in Putnam v. Head, we identify the relevant state court decision in this case as the Georgia Supreme Court's denial of petitioner's certificate of

81

probable cause to appeal the superior court's denial of habeas relief. 268 F.3d at 1242. We characterize the denial as a decision on the merits because, under Georgia Supreme Court Rule 36, a "certificate of probable cause to appeal a final judgment in a habeas corpus case involving a criminal conviction will be issued where there is arguable merit"; thus, the rejection of petitioner's application for a certificate of probable cause to appeal was, implicitly, a determination that none of petitioner's claims had arguable merit. Since <u>Williams</u> was decided before the court denied petitioner leave to appeal, <u>Williams</u> constitutes "established Federal law" under AEDPA. 28 U.S.C. § 2254(d)(1).[63]

Second, although the relevant state court decision came down on October 1, 2002, before <u>Wiggins</u> and <u>Rompilla</u> were decided, these two decisions still constitute "clearly established Federal law," for the <u>Williams</u> Court instructed that "whatever would qualify as old rule under <u>Teague</u> jurisprudence will constitute 'clearly established Federal law, as determined by the Supreme Court of the

---

[63] The Fifth Circuit has expressed some concern that defining the relevant state court decision as potentially including a state habeas proceeding could expand a federal court's ability under AEDPA to utilize new law, created by the Supreme Court after the conclusion of petitioner's direct appeal. <u>See Williams v. Cain</u>, 229 F.3d 468, 475 n.6 (5th Cir. 2000) (arguing that defining the relevant state court decision as the decision denying collateral relief would "almost completely eviscerate the previous law of non-retroactivity"). We think it would not. The independent application of the <u>Teague</u> analysis will still prevent the application of any new rule established after a petitioner's conviction becomes final on direct appeal, regardless of our definition of the relevant state court proceedings. <u>See Horn</u>, 536 U.S. at 272, 122 S. Ct. at 2151 (requiring courts to perform separate AEDPA and <u>Teague</u> analysis).

82

United States' under § 2254(d)(1). " 529 U.S. at 412, 120 S. Ct. at 1495; see also Frazier, 430 F.3d at 706 (following Williams to grant a habeas petition based on a Supreme Court case decided after the relevant state court decision, because the case was an old rule under Teague). In Wiggins, although the Court did not cite Williams for the proposition that an old rule will always constitute clearly established Federal law, regardless of when the rule was announced, it nonetheless applied that proposition. 539 U.S. at 522, 123 S. Ct. at 2536–37. The Wiggins Court applied Williams, an old rule under Teague, in analyzing Wiggins's claim, thereby implicitly treating Williams as clearly established federal law, despite the fact that Williams was decided after the relevant state court decision was reached. Id.

In addition, it does not offend the comity and finality concerns that are at the heart of AEDPA's required deference to state court decisions if, under Teague, we apply an old rule in disposing of a habeas claim, because our independent application of Teague already protects these concerns. See Williams, 529 U.S. at 318, 120 S. Ct. at 1506 (Stevens, J., concurring) ("Teague . . . explain[s] that a federal habeas court operates within the bounds of comity and finality if it applies a rule 'dictated by precedent existing at the time the defendant's conviction became final.'") (citation omitted). It does, however, allow us to consider the

most recent guidance from the Court on the application of its precedent to the varied factual scenarios that come before us, which is of significant value, for example, in addressing a claim that counsel was ineffective or a claim that the accused's confession was involuntary, where we are called upon to review the application of a general rule to a specific factual scenario. See Crawford, 311 F.3d at 1315 n.2 ("Nonetheless, we find the Williams decision helpful and relevant to the extent that it reveals the proper application of previous Supreme Court precedent concerning claims of ineffective assistance of counsel during the penalty phase of a capital case."); Williams v. Allen, 458 F.3d 1233, 1251 n.1 (11th Cir. 2006) (Barkett, J., concurring) ("Contrary to the state's argument on appeal, Rompilla and Wiggins, although they post-dated the relevant state-court proceedings, are relevant to our consideration of Williams's Strickland claim, for they both clarify Strickland's applicability.") (citation omitted).[64]

---

[64] We add one postscript to the above analysis. Overall, our application of Teague and the "established Federal law" clause of § 2254(d)(1) is largely congruent, which is as it should be, given that Teague and AEDPA implement many of the same underlying policies, such as ensuring the finality of criminal convictions and furthering comity between federal and state courts. See Gilmore v. Taylor, 508 U.S. 333, 340, 113 S. Ct. 2112, 2116, 124 L. Ed. 2d 306 (1993) ("The 'new rule' principle . . . validates reasonable, good-faith interpretations of existing precedents made by state courts and thus effectuates the States' interest in the finality of criminal convictions and fosters comity between federal and state courts.") (citation omitted); Wright, 278 F.3d at 1255 ("Those amendments, including the one that resulted in § 2254(d), plainly were intended to require greater federal court deference to state court decisions and to promote more federal-state judicial comity.").

Teague and AEDPA are not entirely congruent, though, because our definition of the

To reiterate briefly, by applying the above principles to <u>Williams</u>, <u>Wiggins</u>, and <u>Rompilla</u>, we conclude that all three cases constitute clearly established federal law: <u>Williams</u>, because it was decided before the relevant state court decision; <u>Rompilla</u> and <u>Wiggins</u>, because they are "old rules" under <u>Teague</u>. Having reached this conclusion, we turn to the question of whether the state habeas court's decision is contrary to, or an unreasonable application of, <u>Strickland</u>, <u>Williams</u>, <u>Wiggins</u>, and <u>Rompilla</u>. We conclude that it is not.

5.

Petitioner's argument that the habeas court's decision cannot be squared with the controlling Supreme Court precedent is twofold. First, petitioner claims that under <u>Strickland</u>, Manning's investigation of his background was unreasonable as a matter of law: Manning was given enough information to launch a thorough background investigation, and he knew that a background investigation

relevant state court decision as the decision on the merits of the claim means that AEDPA may in some cases restrict the scope of our review even further than <u>Teague</u>, when the relevant state court decision occurs before the conclusion of direct appeal. For example, suppose a petitioner's claim is heard by an intermediate appellate court sometime before the conclusion of the direct appeal process. The state supreme court denies certiorari and the denial does not constitute a decision on the merits. The Supreme Court, however, issues a new rule under <u>Teague</u> after the intermediate appellate court decides the claim but before the direct appeal process concludes. On these facts, while we could apply this new rule retroactively on collateral attack under <u>Teague</u>, we would not be able to do so under our interpretation of AEDPA, because our review is limited to Supreme Court decisions at the time of the relevant state court decision, i.e., the intermediate appellate court's decision.

was essential to an adequate preparation for the penalty phase of the trial. Petitioner then analogizes Manning's failure to investigate his background to conduct of trial counsel the Supreme Court has held to be ineffective and concludes that the state court's decision was contrary to, or an unreasonable application of, Strickland, Williams, Wiggins, and Rompilla.

Second, petitioner reminds us that Strickland looks to prevailing professional norms at the time of trial as a yardstick by which to assess the reasonableness of counsel's performance. See Strickland, 466 U.S. at 688, 104 S. Ct. at 2065 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."). Applying this yardstick, petitioner measures Manning's conduct and concludes that it fell outside the norms that address the need for background investigations in capital cases. He supports his conclusion with citations to cases we decided prior to the time of his trial, ABA guidelines, affidavits from experienced capital defense attorneys, and admissions Manning made while testifying before the state habeas court.

Before addressing petitioner's arguments, we reiterate some long-standing principles that guide our review of a counsel's decision to limit his investigation. We then discuss how a reasonable attorney, in Manning's position, would have investigated petitioner's background. Finally, we directly respond to petitioner's

86

arguments, concluding, as did the state habeas and federal district courts, that Manning's performance was reasonable.

In evaluating the reasonableness of a defense attorney's investigation, we weigh heavily the information provided by the defendant. Strickland, 466 U.S. at 691, 104 S. Ct. at 2066 (1984) ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information."). Indeed, "[b]ecause information about childhood abuse supplied by a defendant is 'extremely important' in determining reasonable performance, '[w]hen a petitioner . . . does not mention a history of physical abuse, a lawyer is not ineffective for failing to discover or to offer evidence of abuse as mitigation.'" Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1211 (11th Cir. 2007) (quoting Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1325 (11th Cir. 2002)). As we stated in Williams v. Head, "[a]n attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him." 185 F.3d 1223, 1237 (11th Cir. 1999). Petitioner never contended, and nothing in the record as much as suggests, that he informed

Manning about the abuse he suffered as a child. Petitioner never even provided

Manning with the names of his family members.[65] In fact, in testifying in his own

defense during the penalty phase of his trial, he referred to his family only with

this brief statement: "[M]y father had built a church, I was [sic] a very religious

family when I was raising [sic] up."

We have also emphasized the importance of a mentally competent client's

instructions in our analysis of defense counsel's investigative performance under

the Sixth Amendment. Rutherford v. Crosby, 385 F.3d 1300, 1313 (11th Cir.

2004) (recognizing that the "duty [to investigate] does not include a requirement

to disregard a mentally competent client's sincere and specific instructions about

an area of defense."); Tafero v. Wainwright, 796 F.2d 1314, 1320 (11th Cir. 1986)

---

[65] We note that petitioner did provide the names of his brothers to Dr. Doss, who recorded this information in his notes. Petitioner contends that as part of a reasonable investigation, Manning should have spoken with Dr. Doss or asked to examine his notes and thus could have obtained this information. Manning testified at the habeas hearing that he never spoke with members of the GFS team about petitioner's background because he thought that "since I couldn't get [information about petitioner's background], I didn't think [they] could get it either." Manning's statement seems reasonable. A defendant, we think, would provide information like this to his counsel, charged with defending his life, before he would provide it to a psychiatrist he would likely never speak to again. Petitioner's argument here cuts against him. There is only one reason we can surmise for petitioner's decision not to provide the names of his brothers to Manning, despite Manning's repeated requests for information on petitioner's background and explanation of its importance, but to disclose his brothers' names to a psychiatrist. That reason is that petitioner was afraid Manning would use this information to contact his family, but did not perceive the same risk in providing this information to a psychiatrist. Thus, petitioner's disclosure of this information to Dr. Doss, but not to Manning, further confirms petitioner's desire not to have his family members involved in his trial.

88

("[A] defendant's decision communicated to his counsel as to who he wants to leave out of the investigation, while not negating the duty to investigate, does limit the scope of the investigation."). In Mulligan v. Kemp, we explained why a client's instructions are given such weight: "Because we recognize that a defendant [has the choice whether or not to be represented by counsel], it follows that, in evaluating strategic choices of trial counsel, we must give great deference to choices which are made under the explicit direction of the client." 771 F.2d 1436, 1441 (11th Cir. 1985). The state habeas court found that petitioner specifically instructed Manning not to contact his family and generally discouraged him from researching his past. Petitioner has not challenged these findings.

Petitioner attempts to minimize the significance of his instructions by pointing to the fact that Manning, in testifying before the habeas court, said that he would have disregarded petitioner's instructions altogether had he had more information – information that might have led him to Limecrest, Ohio, and evidence of petitioner's early years there. The question, however, is not what Manning said he would have done, but what a reasonably competent attorney, standing in his shoes, would have done. As noted earlier, the reasonably competent attorney standard is an objective, not a subjective, standard.

89

A reasonably competent attorney taking stock of the situation facing

Manning would recognize the availability of the strategy Manning employed

during the penalty phase of the trial: persuade the jury that petitioner is a good

person, who acted inexplicably and totally out of character in assaulting Beatty,

and that his life should be spared. This strategy could be carried out through the

testimony of several persuasive witnesses, including Patty Parkinson, Beggs,

Bonnie Smith,[66] and the ministers, both ordained and lay, who had come to know

petitioner following his arrest, who could testify first-hand to his goodness and

that his is a life worth saving.[67]

A reasonably competent attorney would also consider whether there is

anything in petitioner's life history – from his upbringing in Limecrest, Ohio,

through the twenty-five years that had elapsed from his departure from Limecrest

in 1960 to his arrival on St. Simon's Island in 1984 – that might serve as more

favorable mitigating evidence or at least buttress the strength of the testimony that

the witnesses Manning presented could provide. To find such mitigating

---

[66] Beggs and Smith testified for the State at the guilt phase of the trial. The court instructed the jury at the end of the penalty phase that it could consider the evidence adduced during the guilt phase in arriving at its sentence.

[67] Under Georgia law, the jury's verdict calling for a death sentence had to be unanimous. Fugate v. State, 431 S.E.2d 104, 108 (Ga. 1993). Absent unanimity, the jury had to recommend a life sentence, and the court would have to impose it.

evidence, the reasonably competent attorney would first ask his client about his background, as Manning did; in this case, the attorney would receive very little information. He would have the one-page, hand written summary petitioner prepared for Manning at Manning's request.[68] The list indicated the following: petitioner was born and raised in Limecrest, Ohio; he attended Shawnee High School there; he left home for California in 1960; from 1961 to 1969, he traveled to Florida, Missouri, Oregon, and back to Florida, during which time he had two failed marriages; and in 1980, he went to Texas, where he met Beggs. The summary indicated that he and Beggs traveled from Texas to Oregon, and from there, in 1983, to St. Simon's Island. In addition to this information, the reasonably competent attorney would know, as Manning knew, that petitioner had served three years, from 1967 to 1970, in a Florida prison for a breaking and entering conviction.[69]

---

[68] According to his testimony before the state habeas court, Manning asked petitioner to prepare a biography of significant events in his life, and petitioner responded with the summary and information described in the above text.

[69] Manning learned about the Florida conviction from the prosecutor, Crowe. After Crowe told him about it, Manning questioned petitioner about the conviction; he responded that it was nothing significant. A reasonably competent attorney would ask petitioner about his criminal record aside from the Florida conviction, but would learn nothing. Crowe told Manning on the eve of trial that petitioner had been arrested in Tennessee for sexually assaulting a woman while he was intoxicated. Crowe intended to introduce the arrest into evidence during the penalty phase of the trial, but Manning persuaded the court to bar the evidence. Petitioner told Drs. Crown and Hyde about the Tennessee arrest; he recalled that he was arrested, and what he was charged with, but said he had no memory of the assault.

Equipped with the foregoing information, the reasonably competent attorney would ask his client more about his background, but would be told, as Manning was, not to contact his family and to stay away from his past. He would not stop there. He would inquire of Beggs and others, as Manning did, but find nothing to augment what he already knew. The report Dr. Clary issued, after examining petitioner, revealed more about his life – that petitioner led a hippie lifestyle after leaving home and had been a heavy drug and alcohol user until the past few years. Petitioner argues that, notwithstanding the above, a reasonably competent attorney would have investigated his childhood, discovered the physical abuse and miserable living conditions described in the affidavits proffered to the state habeas court, and concluded that the same constituted significantly persuasive mitigating evidence. Absent such investigation, his argument continues, a reasonably competent attorney could not have made the tactical decision to pursue the strategy Manning pursued in the penalty phase of petitioner's case. Put another way, Manning could not reasonably have opted for the strategy he followed without conducting an investigation for potential childhood abuse.

To the contrary, our hypothetical attorney could reasonably have concluded that the type of personal history petitioner contends should have been uncovered

92

and presented during the penalty phase would not be probative as mitigation in the eyes of the jury, as we discuss in greater detail in subpart C, infra, and thus would have opted for the strategy Manning pursued. Moreover, when limited by his client's instructions not to contact his family or otherwise delve into his background, a reasonably competent attorney standing in Manning's shoes would have gone no further than Manning did to seek mitigating evidence from the client's past. See Porter v. Singletary, 14 F.3d 554, 559 (11th Cir. 1994) (Counsel's investigation consisting of speaking with defendant was held reasonable, when defendant did not provide counsel with any information about troubled childhood); Mitchell v. Kemp, 762 F.2d 886, 889–90 (11th Cir. 1985) (Counsel's investigation consisting of speaking with defendant and defendant's father held reasonable, when defendant did not provide any information about troubled childhood and told counsel to "leave [his family] out of it.").

We are not persuaded by petitioner's attempt to analogize the present case to Williams, Wiggins, or Rompilla. Petitioner argues that in Rompilla and Wiggins, the defendants did not offer their attorneys leads for investigation; yet, the Court still found counsel ineffective. Drawing analogies to these two cases, petitioner implies that his failure to inform Manning about his abusive childhood should have no bearing on our analysis of his claim.

This argument misstates the holdings in <u>Rompilla</u> and <u>Wiggins</u>. In <u>Rompilla</u>, the defendant's "own contributions to any mitigation case were minimal," but this was irrelevant to the Court's decision on effectiveness. 545 U.S. at 381, 125 S. Ct. at 2462. The Court held counsel ineffective because they failed to examine a readily available file containing information about Rompilla's prior conviction for rape and assault, despite knowing that the prosecutor was planning on using Rompilla's prior conviction as an aggravating factor in seeking a death sentence. <u>Id.</u> at 383, 125 S. Ct. at 2463. The Court never fully addressed the significance of Rompilla's lack of cooperation. <u>Id.</u> ("There is no need to say more [regarding whether counsel should have further investigated Rompilla's background], however, for a further point is clear and dispositive: the lawyers were deficient in failing to examine the court file on Rompilla's prior conviction.").

In <u>Wiggins</u>, the defendant never informed counsel about the sexual abuse he suffered as a child, but did describe his own background as "disgusting" in a pre-sentence investigation report, to which counsel had access. 539 U.S. at 523, 123 S. Ct. at 2536. In addition, the Court never directly addressed the significance of Wiggins's failure to inform counsel about his sexual abuse, because counsel had sufficient information from available records to encourage further

94

investigation into Wiggins's upbringing, independent of any information provided by Wiggins. Id. at 524, 123 S. Ct. at 2537. For purposes of our review under section 2254(d)(1), federal law consists of the holdings of Supreme Court cases, not the dicta, and petitioner is not even relying on dicta; these cases simply say nothing about the significance of Rompilla's or Wiggins's failure to provide information to counsel. See Gore, 492 F.3d at 1294. ("Section 2254(d)(1) explicitly establishes Supreme Court precedent as the vel non of 'clearly established federal law.' Our basis for comparison, therefore, is the holdings – not the dicta – of Supreme Court decisions at the time the Florida Supreme Court issued its opinion.") (citation omitted).

To the extent that the defendants in Wiggins and Rompilla were less than forthcoming with trial counsel, this has a different, and less significant, effect on our analysis than when, as in this case, the petitioner instructs counsel not to contact his family. We find a recent Supreme Court decision, Schriro v. Landrigan, instructive in this regard. __U.S.__, 127 S. Ct. 1933, 1942, 167 L. Ed. 2d 836 (2007). The defendant in Schriro "informed his counsel not to present any mitigating evidence," in a colloquy before the trial judge. __ U.S.__, 127 S. Ct. at 1941. The Court compared this to the defendant's behavior in Wiggins, Strickland, and Rompilla, stating: "Indeed, we have never addressed a situation

like this. In <u>Rompilla v. Beard</u> . . . the defendant refused to assist in the development of a mitigation case, but did not inform the court that he did not want mitigating evidence presented." <u>Id.</u> at 1942. While petitioner's conduct in this case is not as extreme as the defendant's conduct in <u>Schriro</u>, we follow the Court in drawing a distinction between a defendant's passive non-cooperation and his active instruction to counsel not to engage in certain conduct. <u>See</u> <u>Gilreath v. Head</u>, 234 F.3d 547, 550 n.10 (11th Cir. 2000) ("We readily conclude that trial counsel–by relying on Petitioner's instruction not to present mitigating mental health and alcohol abuse evidence–did not perform in an unreasonable manner.").

Petitioner also attempts to characterize <u>Williams</u>, <u>Wiggins</u>, and <u>Rompilla</u> and his case as all falling within the broad category of ineffectiveness due to a failure to investigate. Manning's conduct, however, is not analogous to the conduct held to be ineffective in any of those other cases. In <u>Wiggins</u>, the Court concluded that it was unreasonable for trial counsel not to continue to investigate his client's personal history, after counsel had reviewed social service records which revealed that Wiggins's mother was a chronic alcoholic and that he had been placed in multiple foster homes. 539 U.S. at 525, 123 S. Ct. at 2537. Another factor in the Court's decision was that counsel decided not to utilize a publicly–funded forensic social worker to compile a social history of Wiggins, a

96

decision that fell short of professional standards prevailing at the time of trial. Id. at 524–25, 123 S. Ct. at 2536–37. In Williams, counsel were held ineffective because they failed to uncover "extensive records graphically describing Williams's nightmarish childhood, not because of any strategic calculation but because they incorrectly believed that state law barred access to such records." 529 U.S. at 395, 120 S. Ct. at 1514.

In the case before us, there are no similar records of the defendant's abusive childhood. See Callahan v. Campbell, 427 F.3d 897, 934–35 (11th Cir. 2005) ("Callahan analogizes the failure of Knight to discover evidence of his abuse to the failures in Williams v. Taylor and Wiggins v. Smith but he overlooks a glaring difference-the evidence of abuse in Williams and Wiggins was documented extensively in public records.") (citation omitted). Petitioner's high school record is the only documentary evidence that petitioner points to as having been available to Manning, but that record only indicates that he was a poor to average student before dropping out of tenth grade; it does not contain information comparable to that found in Wiggins's or Williams's social services records.[70]

_____

[70] Petitioner's school records show a twelve–point drop in his IQ score from 98 in seventh grade to 86 in tenth grade. Three previous tests, however, taken between second and seventh grade, reveal IQ scores ranging from 103 to 98. Thus, taken as a whole, these tests are not a strong indicator of the long– term childhood abuse described in affidavits petitioner proffered in support of his habeas petition. Instead, the anomalous twelve–point drop could just as plausibly be seen as the result of poor performance on a single test.

Petitioner further argues that Manning's failure to send a publicly-funded investigator to Ohio to research his personal history is analogous to counsel's failure in Wiggins to utilize a forensic social worker. The Wiggins Court, however, did not find counsel's failure to utilize a social worker per se ineffective; rather, it was that such failure rendered counsel's performance deficient under the relevant professional standards. 539 U.S. at 524–25, 123 S. Ct. at 2536–37. Petitioner's argument on this point is based solely on a statement Manning made in his testimony before the state habeas judge, to wit: "It was not unusual for me or a predecessor to ask [the investigator] to go outside the county or outside the circuit to do investigative work. Indeed, I can recall one trip he made to upstate New York to attempt to locate people that we had been advised might know something about a situation." Petitioner has proffered nothing to establish that sending an investigator out of state was the professional standard in Georgia in 1987, when he not only failed to acquaint Manning with his personal history, but specifically instructed him not to send an investigator and not to contact his family. Rompilla is distinguishable on its face. Manning's failure to investigate petitioner's childhood is not analogous to the defense lawyers failure in Rompilla to review a readily available file, which the prosecution intended to use in aggravation. 545 U.S. at 383, 125 S. Ct. at 2463.

In arguing that Manning was ineffective, petitioner relies on Strickland's instruction that "[p]revailing norms of practice as reflected in American Bar Assocation standards and the like . . . are guides to determining what is reasonable, but they are only guides." 466 U.S. at 688, 104 S. Ct. at 2065. Petitioner contends that the prevailing norms of practice at the time of his trial required a more extensive investigation into his background than Manning performed, regardless of his instructions. He relies on four sources for the prevailing norms of practice.

First, petitioner invokes Standard 4-4.1 of the 1982 ABA Standards for Criminal Justice.[71] The ABA Standards are "'only guides' and do not set the constitutional baseline for effective assistance of counsel." Rompilla, 545 U.S. at 400, 125 S. Ct. at 2473. (Scalia, J., dissenting) (quoting Strickland, 466 U.S. at 688–89, 104 S. Ct. at 2065); see Chandler, 218 F.3d at 1317 ("In particular, we do not understand the Supreme Court to make the ABA Standards part of the highest law of the land, even if one accepts that those standards reflect a good policy.").

---

[71] The standard reads: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty." American Bar Association Standards for Criminal Justice § 4-4.1 (2d ed. 1982 Supp.).

Even if we were to accept the ABA Standard as a guide in this case, however, the standard simply does not provide proof that Manning's conduct violated some specific norm of practice, for it only imposes a general "duty to investigate." Petitioner cites to this particular ABA Standard because the Rompilla Court invoked the same standard. But the Court, in contrast to petitioner, used the standard to show how Rompilla's counsel's failure to review a key file in the government's possession fell short of a precise norm: "The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities." 545 U.S. at 387, 125 S. Ct. at 2466.[72]

Second, petitioner relies on Manning's answer to the following question put to him by habeas counsel at the hearing on his petition: evidentiary hearing:

> HABEAS COUNSEL: Notwithstanding what Mr. Newland did or did not tell you, you recognized that you had a duty to investigate the facts potentially bearing on mitigation so you could decide what to do and what not to do and what mitigation evidence to present, right?
> MANNING: Yes.

Trial counsel's admission of error in an habeas evidentiary hearing does not

---

[72] Petitioner also cites the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, which reads: "The investigation for preparation of the sentencing phrase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." Guideline 11.4.1(C). These guidelines are more specific, but they were adopted in 1989, so it is not clear as to what extent they reflect norms of practice in Georgia at the time of petitioner's trial. Also, Guideline 11.4.1(C) refers to "initial assertions" by the client. In the matter at hand, the state habeas court found that petitioner repeatedly asserted that he did not want Manning to contact his family.

control our review. See Gilliam v. Sec'y for the Dep't of Corr., 480 F.3d 1027, 1034 (11th Cir. 2007) ("That defense counsel has refused to characterize the decision as strategic is not dispositive . . . ."). That point aside, we do not consider Manning's statement an admission of error. Manning acknowledged, of course, that he had a duty to investigate for mitigation evidence. He never admitted, however, unlike trial counsel's specific admissions in Wiggins, that his own behavior deviated from the standard norms of practice. See Wiggins, 539 U.S. at 524, 123 S. Ct. at 2536 ("Counsel's decision not to expand their investigation beyond the PSI and DSS records fell short of the professional standards that prevailed in Maryland in 1989. As [trial counsel] acknowledged, standard practice in Maryland in capital cases at the time of Wiggins's trial included the preparation of a social history report."). Indeed, at the evidentiary hearing, Manning strongly implied that his behavior was consistent with the standards of practice in the late 1980s.[73]

---

[73] MANNING: Part of the problem in assessing – part of your problem, if I might suggest, Judge, is that you've got to look at what I did ten years ago. Also I suggest you need to look at the state-of-the-art –
COURT: At that time.
MANNING: – of trying a case, a death penalty case. This is all pre-O.J. This is all pre-childhood abuse as a defense. You know, this kind of stuff we are used to today. That was not the case. It was pre-Michael Mears and his roving team of specialist attorneys. And I wish that I were trying the case today. It's a different state-of-the-art.

Third, petitioner offers affidavits from two experienced capital defense attorneys, Palmer Singleton and Michael Mears, in which these attorneys discuss their views of what constitutes effective assistance in capital cases. As with statements from trial counsel, statements from other attorneys are not dispositive; indeed, they have little weight in our analysis. Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir 1998) ("Our . . . decisions establish that the reasonableness of a strategic choice is a question of law to be decided by the court, not a matter subject to factual inquiry and evidentiary proof. Accordingly, it would not matter if a petitioner could assemble affidavits from a dozen attorneys swearing that the strategy used at his trial was unreasonable.").

In addition, while Singleton's affidavit does opine regarding standard practice in Georgia at the time of petitioner's trial, Singleton bases his opinion on a faulty premise. Singleton states: "Thus, by the mid-1980s the law already recognized that even where a client refused to cooperate with life history investigations, such non-cooperation did not negate counsel's duty to investigate." The law he refers to is our decision in Thomas v. Kemp, 796 F.2d 1322 (11th Cir. 1986). Thomas is distinguishable from this case, as we will demonstrate. In Mears's affidavit, Mears simply gives his opinion on what counsel should do to prepare for the sentencing phase in a capital case. He does not discuss common

102

practice in Georgia, circa 1987.

Fourth, petitioner argues that several of our decisions created a standard of performance that Manning failed to satisfy. We have cautioned that an attorney may not "blindly follow" a client's instructions not to investigate or use mitigating evidence, but must instead first advise his client which strategies offer the best chance of success. Foster v. Dugger, 823 F.2d 402, 408 n.16 (11th Cir 1987); Thompson v. Wainwright, 787 F.2d 1447, 1451 (11th Cir. 1986). This principle "especially holds true where a possible impairment prevents the client from exercising proper judgment, or where an attorney forgoes a defendant's only plausible line of defense." Foster, 823 F.2d at 408 n.16.

Manning's conduct, however, does not fit within the category of trial counsel "blindly following" a client's instructions. We have found ineffective assistance in the investigation of a client's background, i.e., that counsel blindly followed his client's instructions not to investigate, in several cases. In each of these cases, however, there are other factors that distinguish the attorney's performance from Manning's. In Thompson v. Wainwright, we held counsel ineffective because he acceded to his client's instructions not to investigate or present mitigating evidence, despite his belief that his client was mentally ill. 787 F.2d 1447, 1451–52 (11th Cir. 1986); see also Blanco v. Singletary, 943 F.2d

103

1477, 1500–01 (11th Cir. 1991) (holding defense counsel's failure to investigate to be deficient performance when counsel conducted no investigation prior to trial, despite defendant providing information on his background, and defendant was "noticeably morose and irrational" when instructing counsel not to present any mitigation witnesses).  The state habeas court found that Manning believed that petitioner did not have any mental illnesses and that the Georgia State Forensic team found petitioner to be competent to assist in his defense.  In Dobbs v. Turpin, 142 F.3d 1383, 1388 (11th Cir. 1998), the attorney failed to investigate due to a misunderstanding of law governing admissibility of mitigation evidence; here, petitioner presents no evidence that Manning had any similar misunderstanding.  In Thomas v. Kemp, the attorney presented no mitigation evidence at sentencing because the defendant stated he "did not want anyone to cry for him," and we held that such vague statements "do not support such a waiver [of reasonable investigation]."  796 F.2d 1322, 1324 (11th Cir. 1986).  The state habeas court found that Manning attempted to get additional information from petitioner on several occasions and that petitioner specifically instructed him not to investigate his family.

Moreover, Manning's conduct was in accord with the principle underlying the rule that lawyers cannot blindly follow the client's instructions.  In Thompson,

104

we explained the rationale: "[t]he reason lawyers may not 'blindly follow' such commands is that although the decision whether to use such evidence in court is for the client, the lawyer must first evaluate potential avenues and advise the client of those offering possible merit." 787 F.2d at 1451. (citation omitted). The state habeas court found that Manning explained several times to petitioner the importance of being provided with additional information on his background, but petitioner still refused to cooperate. Manning's conduct thus satisfied the concern we expressed in Thompson, that the defendant is aware of the costs and benefits of his decision. As we stated in Mulligan, "if [counsel] is commanded by his client to present a certain defense, and if he does thoroughly explain the potential problems with the suggested approach, then his ultimate decision to follow the client's will may not lightly be disturbed." 771 F.2d at 1442.

In sum, we hold that the state habeas court properly applied the controlling Supreme Court precedent in finding that Manning's performance satisfied the constitutional mandate. We therefore proceed to petitioner's fall back argument under 28 U.S.C. § 2254(d)(2), that the state habeas court's decision was based on an unreasonable determination of the facts.

6.

Petitioner contends that the state court based its conclusion that Manning's

performance satisfied <u>Strickland</u>'s first prong on the fact that Manning did not have "the first lead" from which to conduct an investigation. This factual determination was unreasonable, petitioner asserts, because Manning had multiple leads, such as the identities of the town where he was raised and the high school he attended.

Petitioner misreads the state court opinion. This is the paragraph in the state court's opinion in which the phrase "the first lead" appears:

> Trial counsel had to face the fact that he had no real background information to work with at sentencing, as well as the fact that "there was some rather damming [sic] evidence that I had to face." Trial counsel stated, "There was a big hole in the information that I had about Mr. Newland and the only person I could get it from was Mr. Newland. I attempted to get it from Ms. Beggs and other people that knew Mr. Newland, but I was unable to do it. Petitioner would not provide his attorney "with the first lead."

The state court was quoting Manning, who testified that: "[petitioner] would not provide me with the first lead." The court used this quote as part of its explanation that Manning did attempt to gather information from petitioner, but was unsuccessful. The court did not adopt this quotation from Manning as finding of fact, nor did it base its decision on the supposition that Manning did not have "the first lead" to follow. Rather, as stated in subpart 3, <u>supra</u>, the court's decision was based on several factors, most significantly, petitioner's instruction to Manning

not to investigate his background.[74]

B.

As indicated in part II.A, <u>supra</u>, on January 15, 1987, well in advance of

petitioner's scheduled trial date, Manning moved the trial court for the

appointment of a psychiatrist to examine petitioner to determine both his

competency to stand trial and his sanity at the time of the offense. At the hearing

before the state habeas court, Manning testified that his observations of petitioner

prior to that time gave him no reason to request a psychiatric evaluation; he filed

the motion because it was his practice to do so in serious criminal cases. The

motion also requested the appointment of a neurologist. Dr. Jesse Hunt, a

---

[74] Petitioner makes another argument, similarly founded on a misreading of the state court's opinion, that the state court's decision was based on an unreasonable determination of fact. The state court found that "the record is clear that Petitioner has not demonstrated that there were numerous people with contemporary knowledge of Petitioner during this time, who were available and willing to testify [at the sentencing phase]." Petitioner submits that, contrary to the state court's assertion, his brothers and several of his neighbors from Limecrest, as indicated in their affidavits, were available and willing to testify. The state court, though, was referring to witnesses with "contemporary knowledge of Petitioner"; i.e., witnesses who knew petitioner at the time he attacked Beatty. Petitioner, anticipating this response, further argues that "to the extent that the habeas court is excluding, as a category of mitigation evidence, witnesses who do not have 'contemporary' knowledge of a defendant . . . the court's holding is directly contrary to <u>Strickland</u> and its progeny . . . pertaining to what a defendant may present as mitigating evidence in a capital case." The state court, though, was not holding that the proffered affidavits from petitioner's brothers and neighbors were excluded from its consideration; the state court's reasons for rejecting petitioner's argument, as discussed in subpart 3, <u>supra</u>, had nothing to do with these affidavits. The state court was simply stating that petitioner had not proven that there were mitigation witnesses available to Manning in Glynn County, at the time when Manning was preparing for petitioner's trial. This statement was part of a larger discussion as to why Manning called the witnesses, at the sentencing phase, that he did. Petitioner provides no evidence that the habeas court's statement was incorrect.

107

physician employed by the Glynn County Detention Center, had recommended that petitioner be seen by a neurologist since he was complaining of headaches.

The trial court heard Manning's motion on January 21, 1987, and granted it. Petitioner would be seen by Georgia Forensic Services ("GFS") at the Georgia Regional Hospital and by Dr. William Clary, a private neurologist in Savannah, in the event GFS was unable to provide a neurological examination. The court asked Manning if, in addition to this, he was seeking an independent evaluation, and he replied, "not at this time." As he testified at the state habeas hearing, whether he would seek an independent evaluation would depend on GFS's and Dr. Clary's findings.

After reviewing the reports submitted by Drs. Doss and D'Alesandro of GFS and Dr. Clary, which ruled out the possibility that petitioner's criminal behavior the night of the murder was caused by a psychological or neurological disorder, Manning did not return to the court for funds for an independent evaluation; he had no reason to fault these experts' opinions. In his mind, Dr. Clary "was the leading neurologist in the area," and Dr. D'Alesandro, although he was employed by the State of Georgia, was "as objective as any other mental health professional." Moreover, in his interaction with petitioner, Manning observed nothing abnormal. Petitioner appeared to be in good health, he "could

speak clearly [and] was lucid." He was "certainly no problem to communicate with and deal with." Manning thought that petitioner's post-confession claim of memory loss appeared to be a "defense mechanism" petitioner employed to avoid confronting the fact that he had murdered a friend, not a sign of mental illness.

Habeas counsel submits that the GFS team, Dr. Clary, and Manning were wrong in ruling out the possibility that petitioner's behavior at the time of the murder was caused by a psychological or neurological disorder. Competent psychological and neurological examinations would have disclosed what Drs. Crown and Hyde opined in their affidavits presented to the habeas court: petitioner was suffering from organic brain damage and a mood disorder, termed Alcohol Induced Rage Disorder, which explained his behavior at the time he assaulted Beatty. Counsel claims that Manning had two opportunities to discover the brain damage and the rage disorder, and that had he pursued either of them, there is a reasonable probability that the jury would not have returned a death-sentence verdict.

The first opportunity came at the January 21 hearing on Manning's January 15 motion to have petitioner examined by a psychiatrist and a neurologist to determine his competency to stand trial and his sanity at the time of the offense. The court asked Manning whether he was seeking an independent evaluation

(presumably at the State's expense) and he replied "not at this time." Manning should have seized this opportunity, it is submitted, meaning that petitioner would have been seen privately before being examined by the forensic team at GFS and Dr. Clary; a private evaluation by experts such as Drs. Crown and Hyde would have led to the opinions they expressed in their affidavits. The second opportunity came after GFS and Dr. Clary filed their reports; at that time, Manning, accepting the court's offer of January 21, could have sought a second opinion, which again, would have led to opinions such as Drs. Crown and Hyde gave. The habeas court considered the second opportunity, but not the first. We consider both, in order.

## 1.

Regarding the first opportunity, habeas counsel does not suggest that Manning should have asked for an independent evaluation at public expense pursuant to Uniform Superior Court Rule 3.14.[75] Such a request would not have

---

[75] Rule 31.4, which was in effect at the time of petitioner's prosecution, provided in relevant part:

> (A) In pending superior court cases . . . where the mental competency of an accused is brought into question, the judge may, upon a proper showing, exercise discretion and require a mental examination at public expense. A motion for mental evaluation may be filed in writing, setting out allegations and grounds for such motion, praying for a court-ordered evaluation. The judge may enter an order requiring a mental evaluation . . . for the purposes of evaluating competency to stand trial. The judge may direct the Department of Human Resources to perform the evaluation at a time and place to be set by the department in cooperation with the county sheriff. . . . Unless otherwise ordered by the court the department shall submit its report to the requesting judge, the defendant's attorney and the prosecuting attorney.

accomplished Manning's goal, which was a determination of whether there was a psychological or neurological explanation for petitioner's behavior the night of the murder; Rule 31.4 could not have provided that. Rather, Manning should have asked for funds for an independent evaluation pursuant to the court's inherent power. This implies that the court would have been willing, in the exercise of its discretion, to give the defendant the first crack at deciding the questions the court ordered GFS and Dr. Clary to address: the defendant's competency to stand trial, which the court had to determine prior to trial, and his sanity at the time of the offense, a matter for the jury to resolve.

Counsel cites no Georgia decision for the proposition that the court would, or could, have done this, and we find none. To the contrary, we take judicial notice that when the competency of a defendant to stand trial is called into question – whether by defense counsel, the prosecutor, or the court on its own initiative – the universal practice is that the court orders the defendant examined

---

(B) Upon the filing of a Plea of Mental Incompetency to Stand Trial, the judge shall determine from the prosecuting attorney and the defense attorney whether a specially empaneled jury is required to determine the issue of mental incompetency to stand trial ahead of the trial of the case on the merits.

Habeas counsel does not suggest that Manning should have entered, on petitioner's behalf, a plea of incompetency pursuant to O.C.G.A. § 17-7-130.

111

and the results of the examination are communicated to the court and the parties.[76]

We have never heard of it being done the other way around. Moreover, it makes more sense as a matter of defense strategy for defense counsel to have the results of the court-ordered evaluation in hand before taking the next step. If the evaluation is that the defendant is competent and was sane at the time of the offense, counsel may seek a second opinion, which if unfavorable to the defendant, need not be communicated to the prosecution or the court. In short, although the habeas court did not consider the argument that Manning should have seized this first opportunity, we are satisfied that the court would have rejected it in a proper application of Strickland's performance prong.

2.

Habeas counsel argues that notwithstanding the findings contained in the reports Drs. D'Alesandro, Doss, and Clary filed, and his own observations of petitioner's mental health and acuity, which indicated that petitioner was not laboring under a psychological or psychiatric defect on the night of the murder,

---

[76] As indicated in note 75, supra, under Georgia law, the results of the court-ordered examination are provided to the prosecutor and defense counsel, in addition to the court. Federal law is to the same effect. 18 U.S.C. § 4241(b), requires that, if the court orders a psychiatric or psychological examination of the defendant, the report of the examination is to be "filed with the court, pursuant to the provisions of [18 U.S.C. §] 4247(b) and (c)." Section 4247(c) states that the report "shall be filed with the court with copies provided to the counsel for the person examined and to the attorney for the government, and specifies the information such report must include."

112

Manning should have sought the court's provision of funds for an independent evaluation of his mental health. Then, with funds in hand, he could have obtained, and presented to the jury, opinions like those rendered by Drs. Crown and Hyde. Counsel did not tell the habeas court what Manning could have shown the trial court as the basis for providing the necessary funds; counsel evidently assumed, without citation of authority, that the funds would have been available to Manning simply for the asking. The assumption is unsupportable, as we indicate in the margin.[77]

In denying petitioner relief, the habeas court concluded that Manning's performance, in not requesting a second opinion, did not fall short of the performance Strickland requires. As the court observed, the reports submitted pursuant to the January 21 order and Manning's personal observations of petitioner gave no indication that he had committed the crimes at issue by reason of a mental illness or neurological deficit – in short, the evidence at hand provided

---

[77] Petitioner cites Ake v. Oklahoma, 470 U.S. 68, 104 S. Ct. 1087, 84 L. Ed. 2d 53 (1985), as constitutional authority for his position. We are not persuaded. In that case, the defendant, who was indigent, unsuccessfully moved the trial court to provide funds for expert assistance in the presentation of his insanity defense at trial. The Supreme Court held that the funds should have been provided because he had shown the trial court that his "sanity [was] likely to be a significant factor in his defense." Id. at 82–83, 104 S. Ct. at 1096. The Georgia Court of Appeals, in referring to this fact prior to the conclusion of petitioner's state habeas proceeding, correctly observed that the "mere filing of a motion does not constitute [such] preliminary showing." Robinson v. State, 368 S.E.2d 533, 534 (Ga. Ct. App. 1988).

Manning with no basis for seeking further evaluation from the private sector.

We have addressed similar situations before, in which neither psychiatric evaluations nor counsel's observations indicated that a petitioner suffered from mental illness. Under these circumstances, we have concluded that counsel performed reasonably in deciding not to seek further evaluation of a petitioner's mental health. See, e.g., Housel v. Head, 238 F.3d 1289, 1296 (11th Cir. 2001) (holding that "[trial counsel's] decision not to expend finite resources developing psychological evidence in mitigation or defense was not unreasonable" when counsel knew that Housel had head injuries but observed nothing unusual about his behavior and two psychological evaluations found no mental problems); Holladay v. Haley, 209 F.3d 1243, 1250-51 (11th Cir. 2000) (holding that it was reasonable for defense counsel not to seek independent mental evaluation, although counsel was aware of petitioner's abusive childhood and previous mental issues, when four court-appointed mental health specialists evaluated defendant and found no issues, and counsel found client to be "articulate and affable"); Mincey v. Head, 206 F.3d 1106, 1118, 1143 (11th Cir. 2000) (holding that it was reasonable for counsel not to seek independent psychological evaluation, although counsel knew petitioner had several head injuries and experienced blackouts, when examination by court-appointed forensic team indicated Mincey had no

114

psychological problems and evaluation by separate psychologist revealed no brain damage); Williams v. Head, 185 F.3d 1223, 1239–40, 1244 (11th Cir. 1999) (holding that it was reasonable for defense counsel not to seek independent evaluation, when previous exam at state facility indicated no mental disorder and petitioner appeared intelligent and attentive to counsel). We see nothing in this case to distinguish it from these cases.

After dismissing petitioner's claim that Manning had rendered ineffective assistance of counsel, the court implicitly assumed that Manning had been constitutionally ineffective and went on to conclude summarily, and without explication, that petitioner had not established Strickland prejudice. The district court agreed with the habeas court, that petitioner had not shown Manning's performance to be ineffective under Strickland; hence, the habeas court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. The district court did not, however, reach the question of whether, assuming arguendo Manning's ineffectiveness, petitioner had shown Strickland prejudice.

C.

We now consider whether the state habeas court misapplied Strickland in concluding that petitioner failed to establish that Manning's conduct prejudiced

115

his case in the penalty phase of the trial.[78]  To satisfy Strickland's prejudice

requirement, a petitioner must prove that "there is a reasonable probability that,

absent [trial counsel's] errors, the sentencer–including an appellate court . . .

would have concluded that the balance of aggravating and mitigating

circumstances did not warrant death."  466 U.S. at 695, 104 S. Ct. at 2069.

According to habeas counsel, had the jury heard the testimony of the family

members and former Limecrest, Ohio neighbors whose affidavits were presented

to the state habeas court and had it received psychological and neurological

opinions like those given by Drs. Crown and Hyde, which were based in large part

on such testimony, the jury probably would have considered the evidence as

establishing mitigating circumstances sufficient to counter the aggravating

circumstances in the case and accordingly rejected the death penalty.[79]  The

testimony of family members and former neighbors would have revealed the

---

[78] Although the state habeas court chose not to explain its conclusion regarding Strickland prejudice, we still utilize AEDPA's deferential standards in reviewing a state court's holding and consider whether there is any reasonable application of the relevant Supreme Court precedent which could have supported the holding.  See Wright, 278 F.3d at 1255.

[79] We assume of course, in addressing the prejudice issue, that petitioner would have informed Manning about his background in the considerable detail he described it to Drs. Crown and Hyde, and then agreed to involve members of his family by permitting them to testify in his behalf.  For ease of discussion, we assume that the psychologist and neurologist Manning would have obtained were Drs. Crown and Hyde.

following.[80]  Petitioner was violently abused by his alcoholic mother when he was

a child, grew up in an impoverished and violent neighborhood, and, given these

surroundings, had begun abusing alcohol and drugs by his early teens.  Petitioner

left Ohio at around age sixteen, in 1960, lived in several states, and in the early

1970s, returned to Limecrest, where he stayed for several years.  During that time,

he appeared to lead a normal life, when sober.  But he continued to abuse alcohol

and drugs, and when intoxicated frequently became violent.[81]

Drs. Crown and Hyde would have augmented this background information

with what they learned from petitioner.  In addition to being physically abused by

his mother, petitioner informed Dr. Crown that he was sexually abused by his

---

[80] In Schriro v. Landrigan, ___ U.S. ____, 127 S. Ct. 1933, 1944, 167 L. Ed. 2d 836 (2007), a capital case, the Supreme Court held that the state habeas court's finding that the defendant "would not have allowed [defense] counsel to present any mitigating evidence at sentencing" precluded the defendant from contending that counsel should have disregarded his instruction and presented the mitigating evidence proffered to the habeas court.  We do not address the question of whether petitioner's instruction to Manning not to involve his family precluded him, under Schriro, from claiming prejudice, here, based on Manning's failure to call family members as witnesses.

[81] Assuming they would repeat what they said in their affidavits before the state habeas court, Clarence Newland, one of petitioner's brothers, would say: "Bobby drank very heavily during the time he lived with me . . . . Bobby was just fine when he was fairly sober – real even – tempered.  But when he drank heavily, he could get real angry, even over something small.  He got into a lot of fights with guys at bars because of that.  Still, he was the nicest guy when he wasn't drinking."  Similarly, Noah Stidham, a former neighbor, would say: "When [petitioner] returned to Ohio, it was in the early 1970s . . . . Almost all of Bobby's money went to drugs and alcohol . . . . Bobby was a nice guy when he wasn't drunk, but he could get really mad when he was.  When he drank, it was like he would become a different person.  He got into fights while he was drinking.  You didn't want to make him mad when he was drinking a lot."

117

maternal uncle during his early adolescence. After leaving Ohio in 1960, he then lived as a self-described "hippie," abusing alcohol and a host of illegal drugs for the next twenty years, until he met Beggs in 1980 and settled down. During that time, he suffered several head injuries – in fights, sometimes with the police, and in workplace accidents.[82] Petitioner also acknowledged to both doctors that he could become violent when intoxicated.[83] Dr. Crown would testify to several instances of such violence, including his sexual assault of a woman in Tennessee in 1978, for which he was arrested and subsequently forfeited bond.

Based on this life history, Dr. Hyde would have opined that petitioner's long-term substance abuse and repeated head injuries had resulted in permanent brain injury; specifically, "bilateral frontal lobe dysfunction." This injury impaired petitioner's ability to control himself, especially when intoxicated. Dr.

---

[82] Dr. Hyde would testify that: "The patient has had multiple closed head injuries. He has been in a lot of fights since his teenage years, both with peers and police. He was never hospitalized with any of these head injuries. In the mid-1970's, while working in construction, he accidentally hit himself in the head with a sledgehammer. He was knocked unconscious for five to ten minutes without obvious neurological sequelae. On November 20, 1976, he was in a motor vehicle accident . . . . He denies any obvious neurological sequelae . . . . He was diagnosed with a cerebral concussion. Skull films were negative . . . . The patient also fell 10 to 13 feet off of some trusses at a construction site around 1970. He landed on his head on the gravel . . . . He went to the hospital with a fractured left arm, but had no obvious neurological sequelae."

[83] Dr. Hyde's affidavit states: "People have told [petitioner] that he tends to be belligerent when intoxicated . . . . The patient claims that he does not have a bad temper, but has been in numerous fights, always when intoxicated." Dr. Crown's affidavit states: "[Petitioner] reports getting into fights, often at bars, and only while drinking. This is corroborated by witness accounts."

Crown would have opined that petitioner suffered from Alcohol Induced Rage Disorder, which made him "vulnerable to feelings of intense rage when he is intoxicated." And he was prone to become intoxicated because, as an alcoholic, he was unable to control his drinking. Turning to the night of the murder, Dr. Crown would have explained, first, why petitioner got drunk that night, and then, why he assaulted Beatty. He would begin by referring to petitioner's childhood abuse and how it eventually led to what happened in Beatty's backyard.

Petitioner's childhood abuse caused petitioner to distrust others. This inherent distrust made it difficult for petitioner to maintain long-term intimate relationships, although the childhood abuse also caused him to deeply desire a stable relationship. This internal conflict, in turn, caused him considerable anxiety, which affected his relationship with Beggs. The more his relationship with her stabilized, the more he became anxious, and the more likely it became that he would turn again to alcohol and drugs. This syndrome reached a climax on May 30; that night, petitioner and Beggs were discussing, so petitioner informed Dr. Crown, their plans to retire together to North Carolina. This discussion provoked so much anxiety that petitioner responded by going on a drinking

119

spree.[84]  The sexual abuse petitioner suffered at the hands of his maternal uncle also caused him to doubt his manhood, such that he was compelled to seek affirmation of his masculinity.  Pursuing that affirmation, he decided to proposition Beatty – which explained why he wound up in her backyard, calling for her to come out.  Dr. Crown would then explain what followed.  As he stated in his affidavit, presented to the state habeas court:

> During Robert's alleged encounter with Carol Beatty, Mrs. Beatty's rejection of a sexual advance, or even a refusal to talk to Robert – in short, any kind of rejection – could have activated Robert's unresolved feelings of anger related to his history of abuse, causing the full-blown Alcohol-Induced Rage Disorder.  Meanwhile, acute alcohol intoxication exacerbated the disinhibiting and judgment-impairing effects of Robert's permanent organic brain damage, making it extraordinarily difficult to control his feelings of anxiety or rage."

So, he killed Beatty.

Habeas counsel did not indicate to the state habeas court whether, if Manning employed this strategy, he would have had to alter the strategy he pursued.  For example, would Manning have portrayed petitioner's criminal conduct as an isolated, unanticipated event, totally out of character?  Would

---

[84] Petitioner also turned to marijuana.  The Georgia Bureau of Investigation report on the results of the blood analysis performed at 6:55 a.m. on May 31, which Sally Watford, the forensic scientist, relied on at trial in testifying to petitioner's BAC, see supra, part II.B, indicated the presence of marijuana in his blood.  Manning and the prosecutor each had a copy of the report, but neither asked Watford to explain the presence of marijuana or opine as to when petitioner had ingested it and in what quantity.

petitioner have taken the stand and testified about the childhood abuse, his long standing alcohol and drug addiction, his propensity to violence when drunk, the Tennessee sexual assault he could not recall, and his five-year imprisonment in Florida? Petitioner would have been subjected to a sweeping cross-examination; and his responses to the prosecutor's questions could easily have inflamed the jury against him. See Tompkins v. Moore, 193 F.3d 1327, 1338 (11th Cir. 1999) ("[A] showing of alcohol and drug abuse is a two-edged sword which can harm a capital defendant as easily as it can help him at sentencing."). How would Manning have prepared the lay and ordained ministers for a cross-examination that would have inquired as to whether their testimony would be different had they known of Manning's alcohol and drug addiction, and his propensity to violence? Habeas counsel has never answered these questions, which to us, are quite obvious. And, what would have transpired had the prosecutor, in rebutting Drs. Crown's and Hyde's testimony, called Drs. D'Alesandro, Doss, and Clary to testify that, in their opinion, Drs. Crown's and Hyde's opinions were unsupportable? As for Dr. Clary, the jury would have been informed that Manning, in presenting his January 15, 1987 motion for a psychiatric and neurological evaluation, effectively vouched for Clary in recommending that the court appoint Clary to examine petitioner.

It appears to us that two strategies are clear: the one Manning pursued, and

the one petitioner advances. Manning's strategy effectively foreclosed the prosecutor from delving into petitioner's lengthy history of drug and alcohol induced violence. Habeas counsel's strategy would have portrayed petitioner as an addict, who knew that when he became intoxicated, he would probably become violent. Experience had taught him that. Under petitioner's proffered strategy, defense counsel, in closing argument to the jury, would try to use petitioner's mental illness to reduce his moral culpability for his attack on Beatty. The prosecutor would counter with the argument that petitioner knew full well what would happen if he got drunk; that he could have avoided what befell Beatty. Dr. Crown's explanation that petitioner was predisposed to drink on the night of May 30 because of the stress caused by his long-term relationship with Beggs would have been greeted with disbelief by the jury, given Beggs's testimony that petitioner had not drunk to the point of intoxication in several years, despite being in a relationship with her for all that time.[85]

Manning testified that presenting a history of childhood abuse to a Glynn County jury in 1987, as a reason for eschewing the death sentence, would have

---

[85] Indeed, such testimony "could potentially alienate the jury as an attempt to excuse truly horrendous conduct." Grayson v. Thompson, 257 F.3d 1194, 1222 n.7 (11th Cir. 2001).

been highly problamatic.[86]  Indeed, this court has recognized that "when a defendant is several decades removed from the abuse being offered as mitigation evidence its value is minimal"; petitioner left his abusive home in Ohio three decades before his attack on Beatty.  Callahan v. Campbell, 427 F.3d 897, 937 (11th Cir.  2005).

The state habeas court, albeit in a summary fashion, concluded that petitioner failed to carry the day on the prejudice issue.  We hold that its decision did not amount to a decision contrary to, or an unreasonable application of, Supreme Court precedent.

VI.

In conclusion, for the foregoing reasons, we hold that the state habeas court properly applied the relevant, and controlling, Supreme Court precedent in dismissing petitioner's ineffective assistance claims.  The judgment of the district court is, accordingly,

AFFIRMED.

---

[86] At petitioner's habeas hearing in state court, Manning testified as follows:  "[Childhood abuse as a defense] was non-existent at that time in Glynn County.  I was aware of some early attempts to do that, but I was also aware that most of it had been discredited."

ANDERSON, Circuit Judge, concurring:

I concur in the result reached by Judge Tjoflat's opinion, and I join all of the opinion except Part V.A.4, which I admire as erudite writing, and which I think is very probably entirely accurate and sound. However, I conclude that I need not address or resolve those complex issues. To resolve this case, I can assume, arguendo (but not decide), that Williams, Wiggins, and Rompilla[1] are fully applicable, but that the state habeas court's decision is not contrary to, or an unreasonable application of, clearly established Federal law (as determined by the Supreme Court) including those cases.

---

[1] The citations for the three cases are respectively: Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495 (2000); Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527 (2003); and Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456 (2005).

WILSON, Circuit Judge, concurring:

I concur in the result. Newland makes a persuasive argument that a defendant's Sixth Amendment right to the effective assistance of counsel cannot be fulfilled when his lawyer conducts virtually no investigation into his client's background before defending him in a death case. Some semblance of an investigation should be necessary before counsel is in a position to settle upon a reasonable sentencing phase strategy. Newland's lawyer, of course, was hampered by the instruction of his client to not investigate his background. Without Supreme Court guidance addressing a lawyer's obligation to conduct an investigation into his client's background when the client instructs otherwise,[1] I concur in the ultimate conclusion that the decision by the Georgia courts regarding counsel's penalty phase representation is not "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

---

[1] *See* ABA Guideline for the Appointment and Performance of Counsel in Death Penalty Cases, 11.4.1 (C) (1989) ("The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered.").